# Exhibit A

 CT Corporation

**Service of Process Transmittal**
04/18/2016
CT Log Number 529010742

TO:     P. Gregory Williams
        T. Rowe Price Associates, Inc.
        Mail Code OM-1450, 4515 Painters Mill Road
        Owings Mills, MD 21117

RE:     **Process Served in New York**

FOR:    T. ROWE PRICE RETIREMENT PLAN SERVICES, INC.  (Domestic State: MD)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Desmond Dyke, Pltf. vs. T. Rowe Price Retirement Plan Services, Inc., Dft. |
| **DOCUMENT(S) SERVED:** | Letter, Summons, Verified Complaint, Verification, Attachment(s) |
| **COURT/AGENCY:** | Kings County: Supreme Court, NY<br>Case # 5043322016 |
| **NATURE OF ACTION:** | Employee Litigation - Wrongful Termination - On December 16, 2013 to January 3, 2014 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, New York, NY |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 04/18/2016 postmarked on 04/14/2016 |
| **JURISDICTION SERVED :** | New York |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after the service of this summons, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Raymond Ragues<br>Ragues PLLC<br>33 West 19th Street<br>4th Floor<br>New York, NY 10011<br>212-766-1100 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/18/2016, Expected Purge Date: 04/23/2016<br><br>Image SOP<br><br>Email Notification,  P. Gregory Williams  gregory_williams@troweprice.com<br><br>Email Notification,  Sean McCaslin  Sean_McCaslin@troweprice.com<br><br>Email Notification,  Brian Conley  Brian_Conley@troweprice.com |
| **SIGNED:**<br>**ADDRESS:**<br><br>**TELEPHONE:** | C T Corporation System<br>111 Eighth Avenue<br>13th Floor<br>New York, NY 10011<br>212-590-9070 |

Page 1 of  1 / MJ

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

DOS 470 (Rev. 10/09)

**DEPARTMENT OF STATE**
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231-0001

Return Services Requested





USPS CERTIFIED MAIL

USPS CERTIFIED MAIL

9214 8969 0059 7935 2169 88

201604130050
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK NY, 10011

State of New York - Department of State
Division of Corporations

Party Served:                              Plaintiff/Petitioner:
 T. ROWE PRICE RETIREMENT PLAN SERVICES,      DYKE, DESMOND
 INC.


 C/O C T CORPORATION SYSTEM
 111 EIGHTH AVENUE
 NEW YORK,  NY 10011


 Dear Sir/Madam:
 Enclosed herewith is a legal document which was served upon the Secretary of
 State on 04/07/2016 pursuant to SECTION 306 OF THE BUSINESS CORPORATION LAW.
 This copy is being transmitted pursuant to such statute to the address
 provided for such purpose.


                                              Very truly yours,
                                          Division of Corporations

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 03/23/2016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

Index No. 504332/2016

-------------------------------------------------------------------

DESMOND DYKE,

Plaintiff designate
KINGS COUNTY
as the place of trial

Plaintiff,

The basis of the venue is
Plaintiff's residence

- against -

SUMMONS

T. ROWE PRICE RETIREMENT PLAN SERVICES,
INC.

Plaintiff resides at
1720 Bedford Avenue
Brooklyn, New York 11225

Defendants

County of KINGS

-------------------------------------------------------------------

To the above named Defendant(s)

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or if the complaint is not served with this summons, to serve a notice of
appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons,
exclusive of the day of service (or within 30 days after the service is complete if this summons is
not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded herein.

Dated: New York, New York
    March 23, 2016

Raymond Ragues, Esq.
RAGUES PLLC
Attorneys for Plaintiff
33 West 19th Street, 4th Floor
New York, New York 10011
(212) 766-1100

Defendant's Address:

T. ROWE PRICE RETIREMENT PLAN SERVICES, INC.
C/O C T CORPORATION SYSTEM
111 Eighth Avenue
New York, NY 10011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------------X

DESMOND DYKE,

                              Plaintiff(s),

           -against-

T. ROWE PRICE RETIREMENT PLAN SERVICES,
INC.

                              Defendant(s).

-----------------------------------------------------------------------X

Index No.:
Date Purchased:

**VERIFIED**
**COMPLAINT**

Plaintiff, by his attorneys, RAGUES PLLC., complaining of the Defendant, respectfully alleges, upon information and belief:

1.     At the time of the commencement of this action, Plaintiff, DESMOND DYKE is a resident of the County of KINGS, City and State of New York.

2.     That at all times hereinafter mentioned, the Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC.was and still is a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York.

3.     That at all times hereinafter mentioned, the Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC.was and still is a foreign corporation duly authorized to do business in the State of New York.

4.     That at all times hereinafter mentioned, the Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC. maintained a principal office at 100 East Pratt Street, Corporate Records, - BA 1020, in the City of Baltimore. County of Baltimore and State of Maryland.

5.      That at all times hereinafter mentioned, the Defendant T. ROWE PRICE
RETIREMENT PLAN SERVICES, INC. maintained a Registered Agent's office at 111 Eighth
Avenue, in the City, County of State of New York.

## AS AND FOR THE FIRST CAUSE OF ACTION

6.      That at all time hereinafter mentioned, the Defendant  T. ROWE PRICE
RETIREMENT PLAN SERVICES, INC, was authorized to provide a full financial service
including managing and protecting retirement accounts to public including the Plaintiff's account.

7.      This action falls within one or more of the exemptions set forth in CPLR §1602.

8.      The cause of action alleged herein arose in the County of Bergen, State of New
Jersey.

9.      Plaintiff had a retirement account (401K) through Nestle Waters North America,
Inc. plan which was maintained by the Defendant T. ROWE PRICE RETIREMENT PLAN
SERVICES, INC.

10.     Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC was
responsible to maintain the Plaintiff's retirement account pursuant to the terms, provisions and
conditions of a written agreement between parties.

11.     Sometime between December 16, 2013 and January 3, 2014, Defendant T.
ROWE PRICE RETIREMENT PLAN SERVICES, INC, terminated Plaintiff's said retirement
account and issued a check based on the instruction of an unauthorized third party.

12.     Plaintiff's account was terminated without Plaintiff's knowledge, permission or
consent.

13.    Defendant, T. ROWE PRICE RETIRMEMENT PLAN SERVICES, INC., has failed, refused or otherwise not paid Plaintiff when Plaintiff demanded the payment.

14.    Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC, knew or should have known said person was not the Plaintiff and said person was not authorized to communicate with Defendant on Plaintiff's behalf.

15.    Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC, breached the terms, provisions and conditions of the contract.

16.    Plaintiff demanded the payment for the monetary damages Plaintiff suffered as a result of willful, reckless and negligent breach of Contract in handling Plaintiff's retirement account by the Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC, its employees, agents and/or servants.

17.    Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC has refused, denied and failed to pay Plaintiff for the damage caused by their willful, reckless and negligent action despite Plaintiff's numerous demands.

18.    That as a result of the foregoing, Plaintiff was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.


## AS AND FOR THE SECOND CAUSE OF ACTION

19.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if set forth at length herein.

20.    The cause of action alleged herein arose in the County of Bergen, State of New Jersey.

21.     Plaintiff had a retirement account (401K) through Nestle Waters North America. Inc. plan which was maintained by the Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC.

22.     Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC had and still has  fiduciary duty to maintain and protect retirement accounts of individuals. including Plaintiff.

23.     Sometime between December 16, 2013 and  January 3, 2014.  Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC, without proper due diligence and verification, terminated Plaintiff's said retirement account and issued a check based on the instruction of an unauthorized third party.

24.     Plaintiff's account was terminated without Plaintiff's knowledge, permission or consent.

25.     Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC, knew or should have known said person was not the Plaintiff and said person was not authorized to communicate with Defendant on Plaintiff's behalf.

26.     Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC, breached fiduciary duty which was owed to Plaintiff.

27.     Plaintiff demanded the payment for the monetary damages Plaintiff suffered as a result of willful, reckless and negligent action in handling Plaintiff's retirement account by the Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC, its employees, agents and/or servants

28.     Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC has refused, denied and failed to pay Plaintiff for the damage caused by their willful, reckless and negligent action despite Plaintiff's numerous demands.

29.     That as a result of the foregoing, Plaintiff  was damaged in a sum which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

**WHEREFORE**, Plaintiff(s) demand(s) judgment against the Defendant herein  on each cause of action in a sum exceeding the jurisdictional limits of all lower courts which would otherwise have jurisdiction, together with the interest, costs and disbursements of this action.

Dated:        New York, NY
              March 23, 2016

                                Yours, etc.


                                _____
                                RAYMOND RAGUES
                                RAGUES PLLC.
                                Attorneys for Plaintiff(s)
                                DESMOND DYKE
                                33 West 19th Street, 4th Floor
                                New York, NY 10011
                                212-766-1100

## ATTORNEY'S VERIFICATION

RAYMOND RAGUES, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under the penalties of perjury: I am an attorney at RAGUES & MIN, attorneys of record for Plaintiff(s),   DESMOND DYKE.  I have read the annexed **COMPLAINT** and know the contents thereof, and the same are true to my knowledge, except  those matters therein which are stated to be alleged upon information and belief, and as to those matters I believe them to be true.  My belief, as to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent information contained in my files.

This verification is made by me because Plaintiff(s) is/are not presently in the county wherein I maintain my offices.

DATED:      New York, NY
            March 23, 2016

_____
RAYMOND RAGUES

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
                                                    Index No.

DESMOND DYKE,

                          Plaintiff(s),

          -against-

T. ROWE PRICE RETIREMENT PLAN SERVICES,
INC.,

                          Defendant(s),

## SUMMONS AND
## VERIFIED COMPLAINT

## RAGUES PLLC
*Attorneys for Plaintiff*
33 West 19th Street, 4th Floor
New York, NY 10011
212-766-1100

2016 04130

# Exhibit B

# TRUST AGREEMENT

## BETWEEN

## T. ROWE PRICE TRUST COMPANY AND

## NESTLÉ WATERS NORTH AMERICA HOLDINGS INC.

## TRUST AGREEMENT
## BETWEEN
## T. ROWE PRICE TRUST COMPANY AND
## NESTLÉ WATERS NORTH AMERICA HOLDINGS INC.

This TRUST AGREEMENT ("**Agreement**") is made by and between NESTLÉ WATERS NORTH AMERICA HOLDINGS INC., a Delaware corporation ("**Employer**"), and T. ROWE PRICE TRUST COMPANY, a Maryland limited purpose trust company ("**Trustee**").

### WITNESSETH

WHEREAS, the Employer sponsors and maintains the Nestlé Waters North America Profit Sharing and 401(k) Plan and Trust ("**Plan**"), a defined contribution plan for the benefit of all eligible employees who participate under the terms of the Plan, including their beneficiaries and alternate payees (individually, "**Participant**" and, collectively, "**Participants**"); and

WHEREAS, the Employer intends that the Plan and related trust shall qualify under Sections 401(a) and 501(a) of the Internal Revenue Code of 1986, as amended (the "**Code**"); and

WHEREAS, the Trustee and Employer entered into an Agreement effective May 15, 2002 ("**Prior Agreement**") as amended; and

WHEREAS, the Prior Agreement no longer accurately reflected all the duties and responsibilities of the parties;

NOW THEREFORE, the Prior Agreement is hereby restated and the Employer desires to establish a trust to serve as the funding vehicle for the Plan as provided under the terms of the Plan and the Employer and the Trustee agree as follows:

NOW, THEREFORE, the Employer and the Trustee agree as follows:

### ARTICLE I. THE TRUST FUND

1.1     Establishment of Trust Fund. The Employer hereby establishes with the Trustee a trust fund consisting of such sums of U. S. currency and such other property acceptable to the Trustee as shall from time to time be paid to the Trustee pursuant to this Agreement. All such money and property, together with all investments and reinvestments made therewith and proceeds thereof, less any payments or distributions made by the Trustee pursuant to the terms of this Agreement, are referred to as the "**Trust Fund**". The Trustee hereby accepts the Trust Fund and agrees to hold it in accordance with the express provisions of this instrument and the requirements of law.

1.2     Effective Date. This Agreement shall be effective as of the date of execution by the parties hereto.

1.3     Named Fiduciary. The Plan Administrator is the named fiduciary of the Plan ("**Named Fiduciary**") within the meaning of Section 402(a)(2) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). The Named Fiduciary shall have the power and duties with respect to the management and control of the Trust Fund as set forth in the Plan and in this Agreement. The term "**Named Fiduciary**," as used throughout this Agreement, is deemed to refer to the Named Fiduciary of the Plan, as set forth in this Section 1.3, and its duly authorized representatives. The Trustee shall not be a Named Fiduciary of the Plan.

1.4     Nature of Trustee's Duties. In performing its duties hereunder, the Trustee shall serve solely in the capacity of a directed trustee within the meaning of Section 403(a)(1) of ERISA. The Trustee shall not be deemed to be the "administrator" as defined in ERISA Section 3(16)(A), the "plan sponsor" as defined in ERISA Section 3(16)(B), or a trustee with discretion to perform more than the express ministerial duties pursuant to the terms of this Agreement.

1.5     Limitation of Trustee's Duties. The Trustee shall have no duty to: (a) determine or enforce payment of any contribution due under the Plan; (b) inquire whether any contribution made to the Trust Fund is in accordance with the terms of the Plan or law; (c) determine the adequacy of the funding policy adopted by the Employer or the Named Fiduciary; (d) inquire as to the propriety of any investment or distribution made under the Plan; or (e) ensure the tax qualified status of the Plan under the Code.

1.6     Tax Qualification and Compliance. The Employer hereby represents and warrants that the Plan, which is intended to qualify as a qualified and tax-exempt plan under Sections 401(a) and 501(a) of the Code, is and will continue to be operated in compliance with the Code, ERISA and other applicable laws. The Employer is responsible for maintaining the tax qualification of the Plan.

## ARTICLE II. INVESTMENT OF THE TRUST FUND

2.1     Investment of the Trust Fund – In General. The Named Fiduciary shall be solely responsible for directing the Trustee as to the investment and disposition of the Trust Fund and shall have responsibility for the overall diversification of the Trust Fund. The Trustee shall invest and reinvest the Trust Fund only as directed and the Trustee is specifically prohibited from having or exercising any discretion with respect to the investment of the Trust Fund.

2.2     Investment Powers of the Trustee. Subject to the limitations of Section 2.1, the Trustee shall invest and reinvest the Trust Fund as directed, free from any limitations imposed by state law on investments of trust funds and without distinction between income and principal, in any investment approved by the Named Fiduciary, including equity or debt securities, insurance policies and contracts, savings and time deposits, investment contracts issued by a bank, insurance company or other financial or similar institution, short-term instruments of deposit, registered investment companies (including any investment company, the advisor of which is an affiliate of the Trustee), investment partnerships or other pooled investment fund, common, collective or group trust funds (including any such fund held or maintained by the Trustee or an affiliate of the Trustee) for commingling assets of participating trusts, including but not limited to assets of retirement plans which are qualified under Section 401(a) of the Code (the instrument of trust creating any such qualified common, collective or group trust fund, to the

extent of the Trust Fund's equitable share thereof, being adopted hereby). The Trustee shall have the power to hold all or a portion of the Trust Fund uninvested pending receipt of clear and proper investment directions or pending receipt of a contribution amount which is necessary to carry out an investment direction.

2.3   Investment Funds. At the direction of the Named Fiduciary, the Trustee shall establish one or more separate investment funds within the Trust Fund, each separate fund being referred to as an **"Investment Fund."** Investment Funds shall be established by direct investment or through the medium of a bank, trust fund, insurance contract or regulated investment company, as the Named Fiduciary shall direct. Each Investment Fund shall be held and administered as part of the Trust Fund, but shall be separately invested and accounted for. To the extent authorized by the Plan and conditioned on the Trustee's acceptance of such property pursuant to Section 1.1 hereof, the Named Fiduciary may direct the Trustee to establish one or more Investment Funds all or a portion of the assets of which shall be invested in securities which constitute qualifying employer securities within the meaning of Section 407(d) of ERISA (**"Qualifying Employer Securities"**). Any such direction shall be deemed to include a certification by the Named Fiduciary that the acquisition and holding of such Qualifying Employer Securities does not constitute a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code. The Employer shall be solely responsible for complying with any securities laws that may apply to Qualifying Employer Securities held in the Trust Fund. The Named Fiduciary shall be responsible for determining that the ability of Participants to direct their Plan investments into investment vehicles made available by the Named Fiduciary, including but not limited to their ability to acquire shares of Qualifying Employer Securities through the Plan, is not inconsistent with the terms of the Plan, including any investment policy that has been adopted by the Plan. Notwithstanding anything in this Agreement to the contrary, no Qualifying Employer Securities will be held in the Trust Fund.

2.4   Participant Instructions. The Named Fiduciary's investment direction to the Trustee may represent the aggregate of investment instructions of Participants with respect to the assets in each Participant's Plan account. All references in this Agreement to directions or instructions provided by the Named Fiduciary shall be deemed to include Participant instructions that are provided to the Named Fiduciary or its agent, including any recordkeeper to the Plan authorized to receive Participant investment instruction, and delivered by the Named Fiduciary or its agent to the Trustee. The Named Fiduciary shall have the duty to select and monitor all Investment Funds or other investment media made available to Participants under the Plan. The Named Fiduciary or its agent shall ensure that all Participants who are entitled to direct the investment of assets in their Plan accounts previously received or receive a copy of all material describing such Investment Funds that is required by law. If a Participant fails to direct the investment of assets in the Participant's Plan accounts as permitted by the Plan, the Named Fiduciary shall direct the Trustee as to the investment of such assets.

2.5   Appointment of Investment Manager. The Named Fiduciary may appoint one or more investment managers, as defined in Section 3(38) of ERISA (**"Investment Manager"**) to manage, acquire and dispose of all or a portion of the Trust Fund or an Investment Fund. The Named Fiduciary shall provide the Trustee with written notice of the appointment of each Investment Manager and of the termination of such appointment and direct the segregation of that portion of the Trust Fund to be managed by the Investment Manager. The Named Fiduciary

also shall provide the Trustee with a copy of the investment management agreement and an acknowledgement by the Investment Manager that it is a fiduciary with respect to the Plan within the meaning of Section 3(21)(A) of ERISA. The Trustee shall be entitled to rely on such documents until otherwise notified in writing by the Named Fiduciary. The Trustee shall invest and reinvest such portion of the Trust Fund under the management of the Investment Manager as directed by the Investment Manager. The Trustee shall be entitled to conclusively rely upon the valuation of any securities or other property held in any portion of the Trust Fund that is provided to it by such Investment Manager for all purposes under this Agreement.

2.6   Plan Loans. At the direction of the Named Fiduciary, the Trustee shall invest assets of the Trust Fund in loans to Participants. Any such direction shall be deemed to include a certification by the Named Fiduciary that such loan is in accordance with provisions of the Plan and ERISA and does not constitute a "prohibited transaction" under ERISA. The Trustee shall accept as collateral for each Participant loan only the appropriate amount of the Participant's Plan account designated by the Plan document or established policies. The Trustee shall invest all loan repayments in accordance with the directions of the Named Fiduciary and shall make distributions of defaulted loans as directed by the Named Fiduciary.

2.7   Investment and Insurance Contracts. In the event that insurance policies or contracts or investment contracts issued by a bank, insurance company or other financial or similar institution (including structured or synthetic investment contracts) are held in the Trust Fund at the direction of the Named Fiduciary or an Investment Manager ("Contracts"), the Trustee shall not be liable for the refusal or inability of any insurance company, bank or other financial institution to issue, change, pay proceeds or make payments due under any Contract; for the form, terms, genuineness, validity or sufficiency of any Contract; or for any delay in payment or proceeds due under any Contract. The Trustee shall not be responsible for the valuation of any Contract and the Trustee shall be entitled to conclusively rely upon such valuation provided by the issuer of the Contract for all purposes under this Agreement. The Trustee shall not be responsible for evaluating or monitoring the financial condition or status of any financial institution or insurance company issuing any such Contract which the Named Fiduciary or an Investment Manager directs the Trustee to hold or to purchase with the Trust Fund.

2.8   Trustee's Duty and Responsibility with Respect to the Trust Fund. The Trustee shall have no duty to question any action or direction of the Employer, the Named Fiduciary, or an Investment Manager or the failure of the Employer, the Named Fiduciary, or an Investment Manager to give directions, or to review the securities or other investments which are held pursuant to directions of the Employer, the Named Fiduciary, or an Investment Manager as to the investment, reinvestment, retention or disposition of any such assets. The Trustee shall not have any responsibility for diversification of such assets, for any loss to or depreciation of such assets resulting from the purchase, retention or sale of assets in accordance with the direction of the Employer, the Named Fiduciary, or an Investment Manager. The Trustee shall not be responsible for any investment action taken or omitted by the Trustee in accordance with any direction of the Employer, the Named Fiduciary, or an Investment Manager; any investment inaction in the absence of an investment direction from the Employer, the Named Fiduciary, or an Investment Manager; or any investment action taken by the Trustee pursuant to an order to purchase or sell securities placed by the Employer, the Named Fiduciary, or an Investment Manager directly with a broker, dealer or issuer.

2.9   Knowledge of the Trustee.  When the Trustee is subject to the direction of the Employer, the Named Fiduciary, or an Investment Manager in performing its duties under this Agreement, the Trustee's responsibilities will be limited to certain ministerial duties with respect to the portion of the Trust Fund subject to such direction, which duties do not involve the exercise of any discretionary authority to manage or control Trust Fund assets and which duties will be performed in the normal course of business by employees of the Trustee, its affiliates or agents who are unfamiliar with investment management ("Ministerial Duties").  Except as required by Section 403(a)(1) of ERISA, the Trustee is not undertaking any duty or obligation, express or implied, to review, and will not be deemed to have reviewed, any transaction involving the investment of the Trust Fund which it is directed to perform by the Employer, the Named Fiduciary or an Investment Manager except to the extent necessary to perform these Ministerial Duties in accordance with such direction.

## ARTICLE III.  OTHER MINISTERIAL DUTIES OF THE TRUSTEE

3.1   Other Ministerial Duties of the Trustee.  The Trustee is authorized and empowered with respect to the Trust Fund to perform the following Ministerial Duties necessary to effectuate the instructions and directions of the Named Fiduciary, the plan administrator (as defined in ERISA Section 3(16)(A)), an Investment Manager or a Participant:

a)  To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

b)  To register any investment held by it in the name of the Trustee or in the name of any custodian or its nominee, with or without words indicating that such securities are held in a fiduciary capacity, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust Fund.

c)  Upon separate written direction from the Named Fiduciary and except as provided in Section 2.10 of this Agreement, to appoint an agent or custodian to hold any property hereunder in bearer form or in its own name or the name of its nominee, which agent or custodian may deposit or arrange for the deposit of any securities or other property in a securities depository or clearing agency.  Any agent or custodian so appointed shall be paid fees as mutually agreed upon by the Employer and the agent or custodian and paid in the same manner as other expenses of the Trust Fund.

d)  To retain original executed documents evidencing loans to Participants made after the effective date of this Agreement and, to the extent provided to the Trustee by the Employer, original executed documents evidencing outstanding loans to Participants made prior to the effective date of this Agreement.

e)  To employ suitable agents, counsel, financial consultants, valuation experts or other professionals (who may also be agents, counsel, consultants or experts for the Employer or the Named Fiduciary) and to pay their reasonable expenses and compensation out of the Trust Fund

if not paid by the Employer; provided, however, that the Trustee shall first notify the Employer and provide the Employer with an opportunity to provide counsel or agents before exercising this right.

f) To trade all securities held in the Trust Fund as soon as possible after an order is received and processed by the Trustee or its agent in accordance with directions of the Employer, the Named Fiduciary or an Investment Manager, taking into account any trade delays which may occur due to stock market constraints or the liquidity of the security.

g) Upon written direction from the Named Fiduciary, to appoint a third party to provide accounting services for separate accounts or custom investments.

Each and all of the foregoing powers may be exercised without a court order or approval.

3.2    Valuation of Trust Fund. The Trustee, as of the valuation date set forth in the Plan and at such other time or times as is necessary or as the Trustee and the Named Fiduciary agree, shall determine the market value of the assets of the Trust Fund. The valuation shall be based upon valuations provided by Investment Managers, trustees of common trust funds, sponsors of registered investment companies, records of securities exchanges or valuation services, market data providers or qualified appraisers. The Trustee has no responsibility to review the valuations received from such sources and may rely upon such valuations without independent investigation unless the Trustee has been informed or knows that the valuations are inaccurate, at which point the Trustee shall contact the Named Fiduciary for direction. Notwithstanding the foregoing, the Trustee shall not be responsible for providing the value of any Contracts, as described in Section 2.7, or for any asset which is not liquid or not publicly traded, the value of which shall be provided by the Named Fiduciary.

3.3    Trust Records. The Trustee shall keep accurate and detailed records of all receipts, investments, disbursements and other transactions required to be performed hereunder with respect to the Trust Fund. The Trustee agrees to treat as confidential all records and other information relative to the Trust Fund. The Trustee shall not disclose such records and other information to third parties except to the extent required by law or as requested in writing by the Employer. The Trustee agrees to permit the Employer to inspect the records of the Trust Fund maintained by the Trustee during regular business hours and to permit the Employer to audit the same upon the giving of reasonable notice to the Trustee. The Trustee further agrees that it will provide the Employer with information and records that the Employer may reasonably require in order to perform audits of such records.

3.4    Confidentiality/ Security of Records. Trustee and Employer agree to treat as confidential and use only in connection with this Agreement all Plan data, records, computer programs and software, reports and other documents, which are furnished to the other under this Agreement. Trustee and Employer will protect the security of such records and will not disclose such records or other information to third parties except as required by law or when requested to do so by the other; provided, however, that the Trustee may disclose such records or information to its agents in the course of performing its duties under this Agreement.

3.5     Accounting.  Within 120 days after the close of the Plan's fiscal year or such other period as the Employer and the Trustee may agree, and within 120 days after the resignation or removal of the Trustee, as provided herein, the Trustee shall file with the Employer a written account setting forth all investments, receipts, disbursement and other transactions effected by it during such fiscal year or during the period from the close of the last fiscal year to the date of such resignation or removal.  Unless the Employer files written objections to such account with the Trustee within 180 days after the filing of such account with the Employer, the accounting shall be deemed to be approved and the Trustee shall, to the maximum extent permitted by applicable law, be released and forever discharged from all liability for further accountability to the Employer for the accuracy of such accounting and for the propriety of all acts and the transactions of the Trustee reflected in such account.  If written objections are specified and the matters in controversy cannot be settled between the Employer and the Trustee, the Trustee may apply for a judicial settlement of the account, the costs of such settlement being allowed as an expense of the Trust Fund.  The only necessary party thereto in addition to the Trustee shall be the Employer.

3.6     Distributions and Other Payments.  The Trustee shall make payment to such persons, including the Employer, the Trustee, the Named Fiduciary, the Plan recordkeeper and Participants, as the Named Fiduciary may direct from time to time.  The Named Fiduciary shall be responsible for insuring that any distribution or other payment from the Trust Fund conforms to the provisions of the Plan and ERISA.  Excluding those fees and expenses set forth in this Agreement and the Plan's recordkeeping agreement, which may be paid from the Trust Fund if not paid directly by the Employer, the Named Fiduciary's direction to pay fees or expenses relating to the administration of the Plan or Trust Fund shall be in the form of a certificate substantially in the form as set forth in Exhibit "A".  Notwithstanding any other provisions of this Agreement, the Trustee may condition any distribution or other payment of Trust Fund assets upon receipt of satisfactory assurances that the approval of appropriate governmental agencies or other authorities has been secured and that all notice and other procedures required by applicable law have been satisfied.  The Trustee shall be entitled to rely conclusively upon the Named Fiduciary's directions and shall not be liable for any distribution or other payment made in reliance upon the Named Fiduciary's directions.

3.7     Limitation of Duties.  The Trustee is a party to this Agreement solely for the purposes set forth herein and neither the Trustee nor any of its officers, directors, employees or agents shall have any duties or obligations with respect to the Trust Fund, except as expressly set forth herein.  To the extent not prohibited by ERISA, the Trustee shall not be responsible in any way for any action or omission of the Employer or the Named Fiduciary with respect to the performance of the Employer's or Named Fiduciary's duties and obligations set forth in this Agreement and in the Plan.  The Trustee may rely upon such information, direction, action or inaction of the Employer or the Named Fiduciary as being proper under the Plan or the Agreement and is not required to inquire into the propriety of any such information, direction, action or inaction.

## ARTICLE IV.  DUTIES OF THE EMPLOYER

4.1     Duties of the Employer.  In addition to any duties of the Employer otherwise prescribed in this Agreement, the Employer, individually or through the Named Fiduciary, shall be responsible for performing the following functions with respect to the Trust Fund:

a)  Transmitting all Trust Fund contributions made by or on behalf of each Participant to the Trustee at such times and in such manner as is mutually agreed between the Employer and the Trustee;

b)  Providing the Trustee with such information and data relevant to the Plan as is necessary for the Trustee to properly perform its duties hereunder;

c)  Providing to the Trustee, on a timely basis, a copy of the Plan document including all amendments and restatements, and a copy of the Plan's determination letter from the Internal Revenue Service;

d)  Determining that the contributions made by or on the behalf of each Participant are in accordance with any applicable federal and state law and regulations;

e)  Assuring that the Plan maintains qualified status under Section 401(a) of the Code at all times while any Plan assets are held in the Trust Fund;

f)  Providing the Trustee with the value of any Contracts;

g)  Determining the suitability of and selecting every investment offered as an option under the Plan;

h)  Determining that loans to Participants are made and administered in accordance with the Plan, ERISA and the Code;

i)  Determining that all payments, including distributions to Participants, are reasonable, proper and in accordance with the Plan, ERISA and the Code;

j)  Determining whether any domestic relations order is "qualified" in accordance with Code Section 414(p) and directing the Trustee as to how to effect any such order; and

k)  Ensuring that a Participant who makes a required or voluntary contribution has previously received or receives a copy of the then current prospectus relating to the investment option(s) to which such contribution is invested.

## ARTICLE V.  VOTING, TENDER AND SIMILAR RIGHTS

5.1     General Provisions.  The Named Fiduciary (or the Investment Manager with respect to assets under its management) shall direct the Trustee as to the manner in which it shall: (i) vote in person or by proxy, general or special, any securities held in the Trust Fund; (ii) exercise

conversion privileges, subscription rights and other options; and (iii) participate in or dissent from reorganizations, tender offers or other changes in property rights. The Trustee shall not take any action on behalf of the Employer or the Plan in any legal proceedings, including bankruptcies or class actions, involving securities held under or formerly held under the Plan, or involving the issuer of such securities, nor will the Trustee file any proof of claim form in connection with such legal proceedings except at the direction of the Named Fiduciary; provided, however, that if such legal proceedings involve Qualifying Employer Securities or relate to claims being asserted against the Employer or an affiliate, the Trustee must have direction from an independent fiduciary in order to file any proof of claim form.

Receipt of Notices. Upon receipt, the Trustee shall transmit to the Named Fiduciary (or to the Investment Manager with respect to assets under its management) all notices of conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other rights or powers relating to any investment in the Trust Fund, which notices are received by the Trustee from its agents or custodian, from issuers of securities and from the party (or its agents) extending such rights. The Trustee shall have no obligation to determine the existence of any conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other right or power relating to any investments in the Trust Fund.

## ARTICLE VI. RESIGNATION OR REMOVAL OF TRUSTEE

6.1     Resignation or Removal of Trustee. The Trustee may resign at any time upon 60 days prior written notice to the Employer and the Employer may remove the Trustee at any time upon 60 days prior written notice to the Trustee. If mutually agreed upon between the parties, the 60 days notice may be waived or reduced. Upon resignation or removal of the Trustee, the Employer shall appoint a successor trustee. Upon receipt by the Trustee of written acceptance of such appointment by the successor trustee, the Trustee shall transfer and pay over to the successor the Trust Fund and all records (or copies) pertaining thereto. The Trustee is authorized, however, to reserve such sum of money or property as it may deem advisable for payment of any liabilities constituting a charge against the Trust Fund or against the Trustee, with any balance of such reserve remaining after payment of all such items to be paid over to the successor trustee. Upon the transfer and payment over of the assets of the Trust Fund and upon the settlement or approval of the account for the Trustee pursuant to Section 3.5 herein, the Trustee shall be released and discharged from any and all claims, demands, duties and obligations arising out of the Trust Fund and its management thereof.

6.2     Employer's Failure to Appoint Successor Trustee. If the Employer has not appointed a successor trustee which has accepted such appointment as of the effective date of the Trustee's resignation or removal, the Trustee shall have the right to apply to a court of competent jurisdiction for the appointment of such successor or for a determination of its rights and obligations, the costs of such action, unless paid by the Employer, being paid from the Trust Fund.

## ARTICLE VII. AMENDMENT AND
## TERMINATION OF THE TRUST AGREEMENT

7.1     Amendment.  The Employer and the Trustee may amend this Agreement at any time by a written agreement between them; provided, however, that no such amendment shall make it possible for any part of the corpus or income of the Trust Fund to be used or diverted to purposes other than the exclusive benefit of Participants and defraying reasonable expenses of administering the Plan and trust created under this Agreement.

7.2     Termination.  This Agreement and the trust created hereunder shall terminate upon the termination of the Plan, unless expressly extended by the Employer.  The trust also shall terminate upon the dissolution or liquidation of the Employer where no successor has elected to continue the Plan and this Agreement.  Termination of the trust shall be effected by distribution of all Trust Fund assets to the Participants or other persons entitled thereto pursuant to the direction of the Named Fiduciary, subject to the Trustee's right to reserve funds as provided in Section 6.1 hereof.  Upon the completion of such distribution, the Trustee shall be relieved from all further liability with respect to all amounts so paid.

## ARTICLE VIII. MISCELLANEOUS

8.1     Exclusive Benefit.  This trust has been established for the exclusive benefit of the Participants.  Except as provided herein, it shall be impossible at any time prior to the satisfaction of all liabilities to the Participants for any part of the principal or income of the Trust Fund (other than such part as is required to pay taxes, administrative expenses or return of contributions to the Employer as provided in Section 8.2 herein) to be paid or diverted to the Employer or to be used for any purpose whatsoever other than for the exclusive benefit of the Participants.

8.2     Return of Contributions.  The Trustee shall return contributions to the Employer upon the Employer's written direction for any of the following reasons: (i) the contribution is made by reason of a mistake of fact as described in Section 403(c) of ERISA, (ii) the contribution is conditioned on initial qualification of the Plan under Section 401(a) of the Code and the Plan does not so qualify, or (iii) the contribution is conditioned on its deductibility under Section 404 of the Code and the contribution is not deductible.  Contributions returned to the Employer under this Section 8.2 shall be paid to the Employer within one year after the Employer's payment of such mistaken contribution, the date of denial of initial qualification or date of disallowance of the deduction, if the Employer so directs the Trustee in writing.  In making such a return of assets to the Employer, the Trustee shall accept the Employer's written direction as its warranty that such return is provided for in the Plan and complies with the Plan document and ERISA Section 403(c), and the Trustee may rely on such warranty without further investigation.

8.3     Nonalienation of Benefits.  No rights or claims to any of the monies or other assets of the Trust Fund shall be assignable, nor shall such rights or claims be subject to garnishment, attachment, execution or levy of any kind; and any attempt to transfer, assign or pledge the same, except as specifically permitted by law, shall not be recognized by the Trustee.

8.4     Written Instruction. Any direction of the Employer or the Named Fiduciary pursuant to any provisions of this Agreement shall be set forth in writing from the Employer or the Named Fiduciary to the Trustee and the Trustee shall be fully protected in relying upon such written direction of the Employer or Named Fiduciary. For purposes of this Section 8.4, written instructions shall include the electronic or telephonic transmission of information or data as mutually agreed upon by the Trustee and the Employer. The Trustee shall be fully protected in relying upon any communication that the Trustee reasonably believes to have been given by the Employer or the Named Fiduciary or their duly authorized representatives, or any individual having apparent authority as such. The Trustee shall receive all directions or instructions in writing provided that the Trustee may accept oral directions for purchases or sales from the Named Fiduciary via telephone or other electronic procedures as agreed to between the Employer and the recordkeeper for the Plan.

8.5     Indemnification and Hold Harmless. The Employer shall indemnify and hold harmless the Trustee (including its employees, representatives and agents) from and against any liability, loss or expense (including reasonable attorneys' fees) arising out of:   (a) the Trustee's performance of its duties or responsibilities under this Agreement, except to the extent that such loss or expense arises from the Trustee's own willful misconduct or negligence, (b) any action taken by the Trustee in accordance with the direction or instructions of  the Employer, the Named Fiduciary, a Participant or an Investment Manager, (c) any matter relating to the Plan for which the Trustee has no responsibility, control or liability under this Agreement, and (d) the failure of the Named Fiduciary or the Employer (including its employees, representatives and agents) to perform its duties under this Agreement or with respect to the Plan; provided, however, that this Section 8.5 shall not be construed to relieve the Trustee from responsibility or liability for any duty imposed upon directed trustees under Section 403(a)(1) of ERISA.

       The Trustee shall indemnify, hold harmless, and defend the Employer, including its affiliates and their employees, officers, directors and agents, from and against any liability, loss and expense (including reasonable attorneys' fees and court costs) that may be incurred in connection with any claim, regulatory proceeding or litigation arising from (i) the negligence or willful misconduct of Trustee or its employees, representatives or agents in  the performance of the Trustee's duties under this Agreement, or (ii) the Trustee's material breach of this Agreement. In the event the Trustee seeks indemnification for losses incurred in connection with an action taken in accordance with the direction or instruction of a Participant (or beneficiary), the Trustee will not be indemnified if such direction or instruction exceeds the scope of directions or instructions that the Employer has permitted to be given by a Participant (or beneficiary). The Trustee shall not make any payment, assume any liability or incur any expense for which indemnification is being sought without obtaining the prior written approval of the Employer.

8.6     Trustee's Fees, Expenses and Taxes. The Trustee shall be paid a fee of $0.00 annually as compensation for its services hereunder. The Trustee shall give 90 days advance written notice to the Employer whenever its fees are changed. Such fees, any taxes of any kind whatsoever which may be levied or assessed upon the Trust Fund, and any expenses incurred by the Trustee in the performance of its duties hereunder, including fees for legal services rendered to the Trustee, shall, unless paid by the Employer, be paid from the Trust Fund.

8.7     Merger, Consolidation or Transfer.  In the event of the merger, consolidation or transfer of any portion of the Trust Fund to a trust fund held under any other plan, the Trustee shall dispose of all or part, as the case may be, of the Trust Fund, in accordance with the written directions of the Named Fiduciary, subject to the right of the Trustee to reserve funds as provided in Section 6.1 hereof.

8.8     Conflict with the Plan Document.  In the event of any conflict between the provisions of the Plan document and this Agreement with respect to the rights or obligations of the Trustee, the provisions of this Agreement shall prevail.

8.9     Construction.  Whenever used in this Agreement, unless the context indicates otherwise, the singular shall include the plural, the plural shall include the singular, and the male gender shall include the female gender.

8.10    Headings.  Headings in this Agreement are inserted solely for convenience of reference and shall neither constitute a part of this Agreement, nor affect its meaning, construction or intent.

8.11    Severability.  If any provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions, and this Trust Agreement shall be construed and enforced as if such provision had not been included.

8.12    Surviving Sections.  Notwithstanding any Sections of this Agreement to the contrary, Sections 6.1, 6.2, 7.2, 8.5 and 8.6 shall survive the termination of this Agreement.

8.13    Law Governing.  This Agreement shall be administered, construed and enforced according to the laws of the State of Maryland and applicable federal law.

8.14    Notices.  All notices and other communications shall be given or served in writing and sent to the Trustee at 100 East Pratt Street; Baltimore, Maryland 21202.

8.15    Predecessor and Successor Trustees.  The Trustee shall not be responsible and shall have no liability for the acts or omissions of any of its predecessors or successors.

8.16    Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of the parties hereto.

8.17    Entire Agreement; Modification.  This instrument contains the entire agreement of the parties signatory hereto.  Except as provided in Section 8.6, no modification, amendment or waiver of any provision of this Agreement will be effective unless in writing and signed by all parties hereto.

8.18   Signature Authority.   The person executing this Agreement on behalf of the Employer certifies that he or she is duly authorized by the Employer consistent with the terms of the Plan to do so.

IN WITNESS WHEREOF, the Employer and the Trustee have caused their duly authorized officers to execute this Agreement on the date as written below.

ATTEST/WITNESS:

_____

ATTEST/WITNESS:

_____

T. ROWE PRICE TRUST COMPANY

By: _____
Vice President

NANCY M. MAITLAND
[Print Name]

Date: ____11/7/2012____

NESTLÉ WATERS NORTH AMERICA HOLDINGS INC.

By: _____

____Charles Broll____
[Print Name]

Title: ____Vice President____

Date: Nov 2 2012

**EXHIBIT A**

TO THE TRUST AGREEMENT BETWEEN
T. ROWE PRICE TRUST COMPANY AND NESTLÉ WATERS NORTH AMERICA
HOLDINGS INC.

PAYMENT OF PLAN EXPENSES FROM THE TRUST FUND

Excluding Plan recordkeeping and Trustee fees and expenses, the Employer shall submit to the Trustee all expenses to be charged to the Trust Fund.  Each submission also shall include the following certification executed by the Named Fiduciary:

I hereby certify that these expenditures reflect administrative expenses solely for the Nestlé Waters North America Profit Sharing and 401(k) Plan and Trust for the period of _____ and that such expenses are proper and reasonable.

Each submission shall also include an explanation of the purpose of the expenditure and an invoice where relevant.

_____

_____

[Print Name]

_____

Title

_____

Date

# Exhibit C

SCHEDULE A
THE PLAN

2014 Restatement

# NESTLÉ WATERS NORTH AMERICA

# PROFIT SHARING AND 401(k) PLAN AND TRUST

# TABLE OF CONTENTS

PAGE

ARTICLE I      DEFINITIONS ................................................................................ 1

ARTICLE II     ELIGIBILITY AND PARTICIPATION ............................... 14

ARTICLE III    PARTICIPANT CONTRIBUTIONS .................................. 15

ARTICLE IV    EMPLOYER CONTRIBUTIONS ...................................... 25

ARTICLE V     INVESTMENTS ............................................................... 31

ARTICLE VI    VESTING ......................................................................... 34

ARTICLE VII   DISTRIBUTION OF BENEFITS ..................................... 37

ARTICLE VIII   LOANS .......................................................................... 48

ARTICLE IX    LIMITATIONS ON CONTRIBUTIONS AND BENEFITS ........... 49

ARTICLE X     TOP-HEAVY RULES ...................................................... 51

ARTICLE XI    ADMINISTRATION ........................................................ 54

ARTICLE XII   TRUST FUND ................................................................. 62

ARTICLE XIII   DESIGNATION OF BENEFICIARY ............................... 63

ARTICLE XIV   AMENDMENT OR TERMINATION .............................. 64

ARTICLE XV    ADOPTION AND WITHDRAWAL ................................. 67

ARTICLE XVI   MISCELLANEOUS ........................................................ 67

SCHEDULE A   BACKGROUND OF PLAN ............................................. 72

SCHEDULE B   EFFECTIVE DATES ...................................................... 74

SCHEDULE C   ADDITIONAL EMPLOYER CONTRIBUTIONS ........... 76

SCHEDULE D   BLACK MOUNTAIN LIVERMORE UNION EMPLOYEES ........ 80

SCHEDULE E   SPECIAL PROVISIONS FOR ROTH ELECTIVE DEFERRALS FOR TRADEWINDS PARTICIPANTS ............................. 87

SCHEDULE F   ELIGIBILITY PROVISIONS ......................................... 90

US2008 5537175.7

## NESTLÉ WATERS NORTH AMERICA
## PROFIT SHARING AND 401(k) PLAN AND TRUST

Effective as of January 1, 2014, NESTLÉ WATERS NORTH AMERICA HOLDINGS INC. hereby amends and restates the Nestlé Waters North America Profit Sharing and 401(k) Plan and Trust (the "Plan"). The Plan (formerly known as "The Perrier Group of America, Inc. Profit Sharing and 401(k) Plan and Trust") was originally established effective January 1, 1985. The Background of the Plan is set forth in Schedule A.

The terms of the restated and amended Plan are as follows:

## ARTICLE I
## DEFINITIONS

1.1 "Account" means the following subaccounts that may be maintained for each Participant to the extent contributions of the particular type are made by or on behalf of the Participant pursuant to the terms of this Plan: Elective Deferral Account, Matching Contribution Account, Rollover Contribution Account, Profit Sharing Contribution Account, and Voluntary After-Tax Contribution Account. In addition, a Participant's Account may include certain subaccounts that were set up for the Participant in order to maintain specific contribution amounts attributable to account balances held for a Participant under a Merged Plan. Special provisions related to the treatment of any such acquisition accounts shall be set forth in a Schedule.

1.2 "Account Balance" means the sum of the balances in a Participant's Account.

1.3 "Affiliated Company" means (a) the Company, (b) a member of a controlled group of corporations of which the Company is a member, (c) unincorporated trades or businesses which are under common control with a Company as determined under Code Section 414(c), (d) an affiliated service group as defined in Code Section 414(m) of which the Company is a member, or (e) any other entity that must be aggregated with the Company under Code Section 414(o). A corporation or an unincorporated trade or business shall not be considered an Affiliated Company during any period while it does not satisfy above clause (a), (b), (c), (d) or (e). For purposes of this definition, a controlled group of corporations is defined in Code Section 1563(a) (determined without regard to Code Sections 1563(a)(4) and (e)(3)(c)).

1

In determining whether the Annual Addition must be reduced under Section 9.2, the percentage in Code Section 1563(a)(1) or in the regulations under Code Section 414(c) shall be deemed to be more than 50% instead of at least 80%.

1.4  "Beneficiary" or "Designated Beneficiary" means a person or persons designated to receive any benefits upon the death of a Participant pursuant to Article XIII.

1.5  "Benefits and Investment Committee" means the committee appointed by the Board of Directors of the Company pursuant to Section 11.1 to be the "plan administrator" and "named fiduciary" of the Plan within the meaning of ERISA.  The Benefits and Investment Committee can delegate any or all of its fiduciary and/or administrative duties under the Plan.

1.6  "Black Mountain Employee" means an individual who was a participant in the Black Mountain Spring Water 401(k) Savings Plan ("Black Mountain Savings Plan") and whose benefit under the Black Mountain Savings Plan was transferred to this Plan.  A "Black Mountain Livermore Union Employee" shall mean an Employee who is employed at the Black Mountain Livermore, CA location and who was covered by the collective bargaining agreement governing members of the Teamsters Local Union Number 278-11 and became a Participant in this Plan on April 1, 2002.  Special terms applicable to Black Mountain Employees are set forth in Schedule D.  Except with respect to the joint and survivor annuity forms of payment as provided in Section 7.4.B of Schedule D, all Employees shall cease to be designated as Black Mountain Livermore Union Employees as of January 1, 2004.

1.7  "Break in Service" means a Period of Severance of twelve (12) consecutive months.

1.8  "Cameron Springs Employee" means an Employee of Cameron Springs on June 4, 2000 who transferred to employment with the Employer on June 5, 2000.

1.9  "Code" means the Internal Revenue Code of 1986, as amended from time to time.

1.10  "Committee Delegate" means the individual(s) appointed by the Benefits and Investment Committee to act on its behalf with respect to certain ministerial duties of the Benefits and Investment Committee (who may be the Employee Benefits Manager or a person or persons in a position with similar responsibilities).  The Committee Delegate shall have the administrative duties and responsibilities assigned to it by the Benefits and Investment

2

Committee; however such duties and responsibilities shall specifically not have the effect of imposing any fiduciary liabilities on the Committee Delegate.

1.11 "Company" means Nestlé Waters North America Holdings Inc. (formerly The Perrier Group of America, Inc.), a corporation organized and existing under the laws of the State of Delaware, or its successor or successors.

1.12 "Compensation" means:

(a)     For purposes of Sections 3.1 and 4.1, the basic compensation paid or payable to an Eligible Employee for the portion of the Plan Year during which he is a Participant, including without duplication (1) overtime; (2) commissions on sales; (3) vacation, sick and holiday pay; (4) absent-paid amounts; (5) amounts deferred pursuant to a salary reduction agreement that is excludable from income, including amounts excluded under Code Section 125, 132(f)(4) or 457; and (6) effective January 1, 2013, special-increase pay; but excluding (i) bonuses; (ii) prior to January 1, 2014, merit lump sums; (iii) prior to January 1, 2013, special-increase pay; (iv) other extra compensation; (v) severance pay; (vi) any other post-employment severance amounts not permitted to be included as compensation under Treas. Reg. Section 1.401(k)-1(e)(8); (vii) contributions or benefits under any qualified retirement plan (except amounts contributed under a salary reduction agreement to the extent those amounts are not includible in gross income by virtue of Code Section 402(g)); (viii) distributions under a nonqualified deferred compensation plan; (ix) amounts paid by third parties; and (x) effective January 1, 2015, payments under short- or long-term disability plans.  Effective for Plan Years beginning on or after January 1, 2009, Compensation shall include differential wage payments (as defined in Code Section 3401(h)(2)) as provided by Section 16.5(b).

(b)     For purposes of allocating a Profit Sharing Contribution under Section 4.3, Compensation shall mean Compensation as defined above for purposes of Elective Deferrals under Section 3.1 and Matching Contributions under Section 4.1, except that it shall exclude all forms of overtime pay, including regular overtime, variable overtime, and overtime shift differential (but not regular shift differential).

(c)     For purposes of paragraphs (a) and (b) of this Section 1.12, the date an Eligible Employee becomes a Participant shall be determined separately with respect to the Profit Sharing Plan and the Qualified Cash or Deferred Arrangement in accordance with Section

3

| US2008 353 173 2

2.1.  For Plan Years beginning on or after January 1, 2002, Compensation of each Eligible Employee taken into account under this Plan shall not exceed $200,000 (or such larger amount as determined by the Internal Revenue Service in accordance with Code Section 401(a)(17) to reflect increases in the cost of living) ($260,000 for 2014).

1.13  "Disability" means a condition under which either (a) a Participant qualifies for benefits under a long-term disability income plan maintained by the Employer or (b) a Participant qualifies for disability benefits under the Federal Social Security Act.

1.14  "Effective Date of Restatement" means January 1, 2014, except as otherwise provided in this Plan document or in Schedule B.

1.15  "Elective Deferrals" means the contributions made to the Plan pursuant to Salary Reduction Agreements in accordance with Section 3.1. A Participant's Elective Deferrals may consist of Basic Contributions (as defined in Section 3.1(d)(1)), Additional Contributions (as defined in Section 3.1(d)(2)) or catch-up contributions as described in Section 3.2.

1.16  "Elective Deferral Account" means the subaccount of a Participant established to receive Elective Deferrals pursuant to Section 3.1 and any similar amounts transferred from a Merged Plan.

1.17  "Eligible Employee" means all Employees of the Employer except:

(a)     Employees covered under the terms of a collective bargaining agreement between employee representatives and the Employer unless the terms of the collective bargaining agreement provides for coverage under the Plan;

(b)     Employees not paid under a U.S. payroll in whole or in part;

(c)     Employees covered under another qualified defined contribution plan maintained by an Affiliated Company or covered under a pension plan that is established and maintained outside of the United States to which an Affiliated Company is required to make contributions on behalf of the Employee;

(d)     Leased employees (as defined in Code Section 414(n)(2) or any other individual required to be treated as an employee under Code Section 414(o));

4

(e)     Individuals for any period during that are either (i) classified by an Employer as an independent contractor, or (ii) not classified as an employee for purposes of federal employment tax withholding, regardless of whether an individual described in this subsection (e) is classified or retroactively reclassified as an employee of an Affiliated Company by any person, entity or agency including, but not limited to the Internal Revenue Service.  For purposes of this Section 1.17, individuals whom an Employer (or an Affiliated Company) classifies as independent contractors or any other individuals not otherwise classified as an Eligible Employee under this Section 1.17 are not Eligible Employees (and therefore they may not become Participants) until the Employer (or an Affiliated Company) affirmatively changes their classification. Therefore, an independent contractor or any other individual who is reclassified by a court, administrative agency, governmental unit, tribunal or other party as an Employee or Eligible Employee will nevertheless not be considered an Eligible Employee hereunder for any periods before the Employer (or an Affiliated Company) implements the reclassification decision, even if the decision applies retroactively;

(f)     Employees specifically designated as excluded in a Plan Schedule.

1.18 "Eligible Participant" means, for purposes of determining Average Deferral Percentages and Average Contribution Percentages, an Eligible Employee who is eligible to participate in the Qualified Cash or Deferred Arrangement.

1.19 "Employee" means any common law employee of the Employer.

1.20 "Employment Commencement Date" means the date on which an Employee is first entitled to be credited with an Hour of Service.

1.21 "Employer" means the Company and any Affiliated Company which, with the consent of the Company, assumes in writing the obligations of this Plan as it applies to it and its Employees.  The Employer shall include (a) Nestlé Waters North America Inc., (b) effective as of June 19, 2001, Modesto Bottled Water, (c) effective as of January 1, 2002, Black Mountain Spring Water, Inc. with respect to its salaried employees, (d) effective as of April 1, 2002, Black Mountain Spring Water, Inc. with respect to its employees covered by a collective bargaining agreement, (e) effective as of January 2, 2005, Poland Spring Employees, (f) effective as of September 5, 2002, NWNA Services, Inc.; (g) effective as of June 1, 2012,  Sweet Leaf Tea Company; and (h) effective as of April 1, 2012, Tradewinds Beverage Company.

5

1.22 "Entry Date" means the first of each calendar month for Eligible Employees classified as regular full-time Employees (as defined in Section 2.1 hereof), and each January 1 and July 1 for all other Eligible Employees, subject, however, to the provisions of Schedule D or Schedule F.

1.23 "Former Teamster Participant" means an employee of the Great Bear location on July 1, 1998 who participated in the Teamsters Pension Plan of Philadelphia and vicinity on June 30, 1998.

1.24 "415 Compensation" means the wages, salaries, fees for professional services and other amounts received by a Participant (without regard to whether an amount is paid in cash) for personal services actually rendered in the course of employment with a Company to the extent such amounts are includible in income (or to the extent amounts would have been received and includible in gross income but for an election under Code Section 125(a), 132(f)(4), 402(e)(3), 402(h)(1)(B), 402(k) or 457(b)). These amounts include, but are not limited to, commissions paid to salesmen, compensation for services on the basis of a percentage of profits, bonuses, fringe benefits, reimbursements, and other expense allowances under a nonaccountable plan as described in Treas. Reg. Section 1.62-2(c). Further, 415 Compensation shall include amounts that are excludable from the income of a Participant under Section 106 of the Code and that are not available to the Participant in cash in lieu of group health coverage under a Code Section 125 arrangement solely because the Participant is unable to certify that he has other health coverage provided that the Employer does not request or collect information regarding the Participant's other health coverage as part of the enrollment process. Notwithstanding the foregoing, the term "415 Compensation" will exclude the following:

(a) Employer contributions to a plan of deferred compensation which are not includible in the Participant's gross income for the taxable year in which contributed, or Company contributions under a simplified employee pension plan to the extent such contributions are deductible by the Participant;

(b) Amounts realized from the exercise of a non-qualified stock option, or when restricted stock (or other property) held by the Participant either becomes freely transferable or is no longer subject to a substantial risk of forfeiture;

6

(c)     Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option; and

(d)     Other amounts which received special tax benefits such as premiums for group-term life insurance (but only to the extent that the premiums are not includible in the gross income of the Participant and are not salary reduction amounts that are described in Code Section 125).

Generally, 415 Compensation is compensation that is actually paid (or treated as paid) or made available to a Participant (or, if earlier, includible in the gross income of the Participant) during a Limitation Year.  For this purpose, 415 Compensation is treated as paid on a date if it is actually paid on that date or would have been paid on that date but for an election under Code Section 125, 132(f), 401(k), 403(b), 408(k), 408(p)(2)(A)(i), or 457(b).

Effective for Limitation Years beginning on or after January 1, 2008, 415 Compensation shall be adjusted for regular pay paid after severance from employment if such amount is paid by the later of within 2½ months after severance from employment with an Affiliated Company or the end of the Limitation Year that includes the date of the Participant's severance from employment with an Affiliated Company, if:

(a)     The payment is regular compensation for services during the Participant's regular working hours, or compensation for services outside the Participant's regular working hours (such as overtime or shift differential), commissions, bonuses, or other similar payments, and, absent a severance from employment, the payments would have been paid to the Participant while the Participant continued in employment with the Employer (or other Affiliated Company);

(b)     The payment is for unused accrued bona fide sick, vacation or other leave that the Participant would have been able to use if employment had continued; or

(c)     The payment is received by the Participant pursuant to a nonqualified unfunded deferred compensation plan and would have been paid at the same time if employment had continued, but only to the extent includible in gross income.

In addition, the following payments paid after severance from employment will be included as 415 Compensation: (A) payments to an individual who does not currently perform

7

services for the Employer (or other Affiliated Company) by reason of qualified military service (within the meaning of Code Section 414(u)(1)) to the extent these payments do not exceed the amounts the individual would have received if the individual had continued to perform services for the Employer (or other Affiliated Company) rather than entering qualified military service, or (B) compensation paid to a Participant who is permanently and totally disabled, as defined in Code Section 22(e)(3), provided that salary continuation applies to all Participants who are permanently and totally disabled for a fixed or determinable period, or the Participant was not a Highly Compensated Employee immediately before becoming disabled.

Back pay, within the meaning of Treas. Reg. Section 415(c)-2(g)(8) shall be treated as 415 Compensation for the Limitation Year to which the back pay relates to the extent the back pay represents wages and compensation that would otherwise be included under this definition.

Any other payment of compensation paid after severance of employment that is not described herein is not considered 415 Compensation, even if payment is made within the time period specified above.

1.25  "Highly Compensated Employee" means any Employee described in Code Section 414(q) (and regulations promulgated by the Internal Revenue Service thereunder) for a Plan Year who: (1) received 415 Compensation in excess of $115,000 (adjusted at the same time and in the same manner as under Code Section 415(d)) for the preceding Plan Year or (2) was a Five Percent Owner for the Plan Year or the preceding Plan Year.

1.26  "Hour of Service" means:

(a)  Each hour for which an Employee is directly or indirectly paid, or entitled to payment, by the Affiliated Company for the performance of duties, and each hour an Employee is paid or entitled to payment on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has been terminated) due to vacation, holiday sickness, incapacity (including disability, layoff, jury duty, military duty or leave of absence) and hours for which back pay has been paid, awarded or agreed to irrespective of mitigation of damages. Hours shall be credited to the Employee for the computation period or periods in which the duties were performed. Hours for back pay shall be credited to the computation period to which the award or agreement pertains. Hours of Service shall be credited

8

to the Employee in accordance with Department of Labor Regulation 2530.200b-2(b) and (c); and

(b)     Hours of Service will also be credited for any individual considered an Employee for purposes of this Plan under Code Section 414(n).

Hours of Service will be credited for any period of an Employee's qualified military service during which Hours of Service are required to be credited under Code Section 414(u).

1.27 "Investment Fund" means any of the separate investment funds which may be made available from time to time by the Benefits and Investment Committee to Participants for purposes of the investment of amounts contributed to and held in this Plan.

1.28 "Key Employee" means any Employee or former Employee who, at any time during the Plan Year that includes the determination date was:

(a)     An officer of the Employer if such individual's annual 415 Compensation exceeds $170,000 (as adjusted under Code Section 416(i)(1)).

(b)     A five percent owner as defined in Code Section 416(i) (including an individual who is a more than five percent (5%) stock owner (or was considered as owning more than 5%, within the meaning of Code Section 318)) of the Employer (determined without aggregating any of the entities), or

(c)     A one percent owner as defined in Code Section 416(i) (including an individual who is a more than one percent (1%) stock owner (or was considered as owing more than 1%, within the meaning of Code Section 318)) of the Employer (determined without aggregating any of the entities) having annual 415 Compensation from the Employer of more than $150,000.

For purposes of subsection (a), no more than fifty (50) Employees (or if lesser, the greater of three (3) or ten (10) percent of the Employees) shall be treated as officers.

1.29 "Late Retirement Date" means, for a participant working beyond his or her Normal Retirement Date, the Participant's Severance from Service Date.

1.30 "Leave of Absence" means an Employee's approved leave of absence from employment with an Affiliated Company for any reason other than retirement, termination of

9

employment or death, including but not limited to military service, illness, disability, pregnancy, educational pursuits, service as a juror, temporary employment with a government agency, or any other leave of absence approved by that Affiliated Company.

1.31 "Limitation Year" means the Plan Year.

1.32 "Matching Contribution" means the amount contributed by the Employer pursuant to Section 4.1.

1.33 "Matching Contribution Account" means the subaccount established to receive Matching Contributions made by the Employer pursuant to Section 4.1 and any similar amounts transferred from a Merged Plan.

1.34 "Merged Plan" means the following plans that have been merged into the Plan: the San Pellegrino USA, Inc. 401(k) Plan, the Black Mountain Spring Water 401(k) Savings Plan, the Modesto Bottled Water, Inc. Profit Sharing and 401(k) Plan, the Nestlé Waters (Sparkling Spring) Profit Sharing and 401(k) Plan, the Tradewinds Beverage Company 401(k) Profit Sharing Plan ("Tradewinds Plan"), and the Sweet Leaf Tea Company 401(k) Plan ("Sweet Leaf Tea Plan"). In addition, any other plan that is merged into the Plan shall become a Merged Plan effective upon the date of the merger.

1.35 "Normal Retirement Date" means the Participant's sixty-fifth (65th) birthday.

1.36 "Non-Highly Compensated Employee" means any Employee of the Employer who is not a Highly Compensated Employee.

1.37 "Non-Key Employee" means any Employee of the Employer who is not a Key Employee.

1.38 "Participant" means an Eligible Employee who participates in this Plan pursuant to Section 2.1.

1.39 "Period of Service" means a period of service beginning on an Employee's Employment Commencement Date or Reemployment Commencement Date, as applicable, and ending on his or her Severance from Service Date. In the case of a Cameron Springs Employee, his Period of Service shall include his period of service rendered to Cameron Springs prior to June 5, 2000. In the case of an individual who was employed by Modesto Bottled Water, Inc. ("Modesto") on June 18, 2001, his Period of Service shall include his period of service rendered

10

to Modesto prior to June 19, 2001. In the case of a participant in the Black Mountain Spring Water 401(k) Savings Plan ("Black Mountain Plan") his Period of Service shall include his service credited under the Black Mountain Plan. In the case of a Participant who participated in the Nestlé Waters (Sparkling Spring) Profit Sharing and 401(k) Plan ("Sparkling Spring Plan"), his service credited under the under the Sparkling Spring Plan. In the case of a participant in the Tradewinds Plan, his Period of Service shall include his service credited under the Tradewinds Plan. In the case of a participant in the Sweet Leaf Tea Plan, his Period of Service shall include his service credited under the Sweet Leaf Tea Plan.

1.40 "Period of Severance" means a period of time beginning on an Employee's Severance from Service Date and ending on the Employee's Reemployment Commencement Date. Solely for purposes of determining eligibility service for an Eligible Employee who is classified by the Employer as a temporary employee, an intern or a seasonal employee, a Period of Severance of one year shall be deemed to be any 12 month eligibility computation period in which the Eligible Employee performs 500 or less Hours of Service.

1.41 "Plan" means the Nestlé Waters North America Profit Sharing and 401(k) Plan and Trust (formerly the Perrier Group of America, Inc. Profit Sharing and 401(k) Plan and Trust) as set forth in this document and as it may from time to time be amended or supplemented. The Plan is intended to qualify as a profit sharing plan under Code Section 401(a) and to include a qualified cash or deferred arrangement. For purposes of this Plan, the portion of the Plan that relates to: (a) Employer contributions as described in Sections 4.2 and 4.8 shall be referred to as the "Profit Sharing Plan"; and (b) a Participant's contributions under a Salary Reduction Agreement as described in Sections 3.1 and 3.2 and Matching Contributions as described in Section 4.1 shall be referred to as the "Qualified Cash or Deferred Arrangement."

1.42 "Plan Year" means a twelve (12) month period commencing January 1 and ending December 31.

1.43 "Poland Spring Employee" means an Employee of an Employer employed at the Poland Spring, Maine facility in a job classification that prior to December 10, 2004 was covered by a collective bargaining agreement.

1.44 "Profit Sharing Contribution" means the amounts contributed by the Employer pursuant to Section 4.2 and Section 4.8.

11

1.45 "Profit Sharing Contribution Account" means the subaccount of a Participant established to receive the Profit Sharing Contribution pursuant to Section 4.2 and/or Section 4.8 and any similar amounts transferred from a Merged Plan.

1.46 "Qualified Employer Contribution" means an Employer's contribution to the Trust Fund under Sections 3.5 and 4.7. Qualified Employer Contributions shall be treated as Elective Deferrals for purposes of vesting under Article VI and distributions under Article VII, but Qualified Employer Contributions shall not be matched under Section 4.1 and shall not be subject to the Code Section 402(g) limit under Section 1.15.

1.47 "Reemployment Commencement Date" means the first date, following a Period of Severance, on which an Employee is entitled to be credited with an Hour of Service.

1.48 "Rollover Contribution" means the amount contributed to the Plan in accordance with Section 3.9 which is an eligible rollover distribution from an eligible retirement plan including (a) a plan described in Code Section 401(a) or 403(a) (excluding after-tax employee contributions), (b) an individual retirement account or an individual retirement annuity described in Code Section 408(a) or (b), and (c) an annuity contract described in Code Section 403(b) (other than an endowment contract).

1.49 "Rollover Contribution Account" means the subaccount established to receive Rollover Contributions made by the Participant pursuant to Section 3.9 and any similar amounts transferred from a Merged Plan.

1.50 "San Pellegrino Participant" means an individual who was a Participant in the San Pellegrino USA, Inc. 401(k) Plan on December 31, 1998 and become an Employee on January 1, 1999.

1.51 "Severance from Service Date" means the date the Employee retires, quits, or is discharged from all Affiliated Companies or dies, or, if earlier, the first anniversary of the date on which the Employee was otherwise first absent from work for all Affiliated Companies. In the case of an Employee on maternity or paternity absence, Severance from Service Date shall mean the second anniversary of such absence. Notwithstanding the foregoing, a Participant does not incur a Severance from Service Date if, in connection with a change of employment, the Participant's new employer maintains the plan with respect to the Participant by continuing or

12

assuming sponsorship of the Plan, by accepting a transfer of Plan assets and liabilities (within the meaning of Code Section 414(l)) or otherwise.

1.52  "Spouse" means, with respect to a Participant, the individual of the opposite sex or the same sex to whom the Participant is lawfully married under the laws of the domestic or foreign jurisdiction (the "Jurisdiction") having the legal authority to sanction marriages in which the marriage was performed (even if the couple is domiciled in a state that does not recognize the validity of the marriage). For this purpose, "marriage" does not include registered domestic partnerships, civil unions or other similar formal relationships recognized under the laws of a Jurisdiction but that are not denominated as marriage under that Jurisdiction. This definition of "Spouse" is effective prospectively as of June 26, 2013.

1.53  "Tradewinds Participant" means an individual who was a Participant in the Tradewinds Plan (as referenced in Section 1.34) on March 31, 2012 and whose benefit under the former Tradewinds Plan was merged into this Plan on April 1, 2012.

1.54  "Trust" or "Trust Fund" means the trust fund or trust funds established under the Plan to hold the assets of the Plan.

1.55  "Trustee" means anyone serving as trustee under the Trust Agreement.

1.56  "Valuation Date" means  the date as of which the Trustee determines the value of the assets in the Trust Fund, which date will be each day the New York Stock Exchange conducts business.

1.57  "Voluntary After-Tax Contribution Account" means the subaccount established under Section 7.7 for Participants (a) who participated in the Arrowhead Water Corp. Individually Vested Employee Savings Trust who had an account attributable to voluntary contributions which was transferred to the Arrowhead Water Corp. Individually Vested Savings Trust from its predecessor plan, and which was transferred to this Plan upon the merger of the Arrowhead Water Corp. plan into this Plan or (b) any Voluntary Contributions transferred from a Merged Plan.

1.58  "Year of Vesting Service" means, a year based on the elapsed time method of crediting service as described in Section 6.2.

13

US2008 553 175 1

## ARTICLE II
## ELIGIBILITY AND PARTICIPATION

2.1 <u>Eligibility</u>

  (a) Each Eligible Employee who is classified by an Employer as employed on a regular full-time basis, shall become a Participant under: (a) the Profit Sharing Plan on the Entry Date which coincides with or next follows the later of three (3) months after his or her Employment Commencement Date and his or her eighteenth (18) birthday and (b) the Qualified Cash or Deferred Arrangement on the later of the date he or she becomes an Eligible Employee and his or her eighteenth (18) birthday.  For purposes of this Section 2.1, employment on (a) a full-time basis shall mean that the Eligible Employee is employed on a basis in which he or she customarily performs at least 36 Hours of Service in a week for an Employer (or, with respect to periods prior to January 1, 2004, 40 Hours of Service in a week for an Employer), and (b) a regular basis shall mean that an Eligible Employee is employed on a basis which is not classified by the Employer as temporary, interns or seasonal.

  (b) An Eligible Employee who either (1) is not employed on a full time basis ("part-time basis") or (2) is not classified as a regular employee (e.g., Employees classified as temporary employees, interns or seasonal employees) shall become a Participant on the Entry Date which coincides with or next follows his or her completion of a Period of Service of six months provided he or she is at least eighteen (18) years of age as of such Entry Date.

  (c) Special rules for eligibility provisions are set forth in Schedules D and F.

2.2 Each Participant in the Plan shall be deemed conclusively for all purposes to have assented to the terms of the Plan and shall be bound thereby.

2.3 A Participant shall cease to participate in the Plan as an Eligible Employee under the Profit Sharing Plan and/or the Qualified Cash or Deferred Arrangement upon his or her Severance from Service Date or, if earlier, upon a transfer to Affiliated Company that has not adopted the Plan except to the extent provided under Section 4.3(b).  Upon his or her Severance from Service Date, the benefits of such Participant, if any, shall, at the election of the Participant, be computed and distributed as provided in Article VII.

US2008 5537/3 7

2.4 If a Participant continues to work beyond his or her Normal Retirement Date, he or she shall continue to participate in the Plan until his or her actual retirement.

2.5 If a Participant incurs a Severance from Service Date, and is subsequently rehired by an Employer, such Participant shall recommence participation in the Profit Sharing Plan on his or her Reemployment Commencement Date provided that he or she is an Eligible Employee and satisfies any participation service requirements specified in Section 2.1; and shall recommence participation in the Qualified Cash or Deferred Arrangement on his or her Reemployment Commencement Date provided that he or she is an Eligible Employee and satisfies any participation service requirements specified in Section 2.1. For purposes of determining whether a rehired Eligible Employee has satisfied his or her participation service requirements under Section 2.1 all prior service for an Employer will be included.

## ARTICLE III
## PARTICIPANT CONTRIBUTIONS

3.1 <u>Enrollment in Qualified Cash or Deferred Arrangement</u>

(a)    <u>Participation in Qualified Cash or Deferred Arrangement</u>.  An Eligible Employee may participate in the Qualified Cash or Deferred Arrangement by making the election provided for in subsection (b) below.  If the Eligible Employee fails to timely make an affirmative election to participate (or not to participate), he or she will be automatically enrolled in the Qualified Cash or Deferred Arrangement as provided in subsection (c) below.

(b)    <u>Election to Participate in a Qualified Cash or Deferred Arrangement</u>.  An Eligible Employee may elect to defer a portion of his or her Compensation by entering into an agreement with the Employer, in a manner approved by the Benefits and Investment Committee, for the Employer to make Elective Deferrals on the Eligible Employee's behalf equal to the amount of Compensation the Eligible Employee has elected to defer (a "Salary Reduction Agreement").  A Salary Reduction Agreement will be applicable to all payroll periods beginning as soon as administratively practicable following the date such Eligible Employee has satisfied the criteria for participation in the Qualified Cash or Deferred Arrangement in accordance with Section 2.1 (or, if later, beginning as soon as administratively practicable after the election is made) and shall remain in effect until changed or canceled by such Participant as specified in Section 2.3. The terms of any such Salary Reduction Agreement shall provide that such

15

Participant agrees to a reduction in Compensation from the Employer equal to a whole percentage of his or her Compensation for each payroll period (the "Elective Deferral Rate"), which may be from 1% to a maximum of 20% (or, prior to April 1, 2012, 15%) of the Participant's Compensation; provided that a Participant's Elective Deferrals may not exceed $17,500 (or such larger dollar amount as is permitted under Code Section 402(g) including such amounts determined by the Internal Revenue Service to reflect increases in the cost of living). The terms of such Salary Reduction Agreement may also provide, if the Participant so elects, that the Participant agrees to an annual scheduled increase election pursuant to section 3.1(c)(3).

      (c)    <u>Automatic Elections to Participate in a Qualified Cash or Deferred Arrangement</u>.

      (1)    <u>Automatic Enrollment for Newly Hired Employees</u>.  An Eligible Employee who is hired on or after March 1, 2007, shall be deemed to have elected an Elective Deferral Rate equal to 6% of his Compensation as soon as practicable after the 45th day following the date on which he is first eligible to participate in the Qualified Cash or Deferred Arrangement under Section 2.1, unless such Eligible Employee makes an election within this 45-day period to have a different Elective Deferral Rate or elects not to make any Elective Deferrals.

      (2)    <u>Rehired Employees</u>. A Participant who has a Reemployment Commencement Date under Section 2.5 shall be deemed to have elected an Elective Deferral Rate equal to a percent that would apply to such Eligible Employee under subsection (b)(1) if his Reemployment Commencement Date was substituted for his date of hire.

      (3)    <u>Automatic Reenrollment for Current Employees</u>.  If as of the April 1st (for Plan Years beginning prior to January 1, 2012, March 1st) of any Plan Year an Eligible Employee is eligible to participate in the Qualified Cash or Deferred Arrangement (under Section 2.1), but is not participating, then such Eligible Employee shall be deemed to have elected an Elective Deferral Rate equal to 6% of his Compensation under a Salary Reduction Agreement (for Plan Years beginning prior to January 1, 2012, 2%) as soon as practicable after the first business day coincident with or next following May 15th (for Plan Years beginning prior to January 1, 2012, April 14th) of that Plan Year ("Automatic Reenrollment").  The Automatic Reenrollment deferral election described in the prior sentence shall not apply to an Eligible

16

Employee for a Plan Year if such Eligible Employee either (A) makes an election within the 45 days following the applicable April 1st (for Plan Years beginning prior to January 1, 2012, March 1st) not to have this deemed election apply for the Plan Year; or (B) for Plan Years on or after January 1, 2012, the Participant has elected to change his Elective Deferral Rate within 60 days prior to the applicable April 1st; or (C) for Plan Years prior to January 1, 2012, the Participant first became eligible to participate in the Plan during such Plan Year. An Eligible Employee shall be subject to Automatic Reenrollment provisions described in this subsection (b)(3) even if in a prior Plan Year such Eligible Employee was subject to automatic enrollment under subsection (b)(1).

   (d) <u>Automatic Increase in Elective Deferral Rates</u>.

     (1) <u>Automatic Increase on or After April 1, 2012</u>. Effective as of April 1, 2012 and each subsequent April 1st, a Participant who as of the applicable April 1st has not elected an Elective Deferral Rate of at least 20% under a Salary Reduction Agreement shall be deemed to have elected as soon as practicable after that April 1st to increase his Elective Deferral Rate by 1%, up to a maximum of 20% (an "Automatic Increase"), unless such Participant makes a prior election not to have such Automatic Increase apply to his Elective Deferral Rate. If for a Plan Year a Participant would be subject to automatic enrollment or Automatic Reenrollment (absent any election to the contrary), then the deemed increase in the Elective Deferral Rate shall not apply to the Participant for that Plan Year. For purposes of this subsection (d)(1), a Participant shall be deemed to have elected not to have the Automatic Increase apply if (A) at any prior time, the Participant has elected not to be subject to such Automatic Increase, or has made specific Automatic Increase elections under subsection (c)(3), (B) the Participant elected to change his Elective Deferral Rate within the 60 days prior to the applicable April 1st Automatic Increase, or (C) for the 2012 Plan Year, the Participant was subject to Automatic Increase under subsection (d)(2) or would have been subject to such increase had his Elective Deferral Rate been less than 10%.

     (2) <u>Automatic Increase Prior to April 1, 2012</u>. Effective as of March 1, 2006 and each subsequent March 1st that occurs before April 1, 2012, an Eligible Employee who as of the applicable March 1st has not elected an Elective Deferral Rate of least 10% (or, in the case of automatic increases that occurred prior to January 2, 2009, 6%) shall be

17

deemed to have elected as soon as practicable after that March 1st to increase his Elective Deferral Rate by 1%, up to a maximum of 10% (or, in the case of Automatic Increases that occurred prior to January 2, 2009, 6%), unless such Eligible Employee makes a prior election not to have such Automatic Increase apply to his Elective Deferral Rate. If for a Plan Year an Eligible Employee would be subject to automatic enrollment or Automatic Reenrollment (absent any election to the contrary), then the deemed increase in the Elective Deferral Rate shall not apply to the Eligible Employee for that Plan Year. For purposes of this subsection (d)(2), a Participant shall be deemed to have elected not to have the Automatic Increase apply if (A) at any prior time, the Participant has elected not to be subject to such Automatic Increase, or (B) if the Participant has a change in his Elective Deferral Rate within the 30 days prior to the applicable March 1st Automatic Increase.

(3)     Scheduled Increase Elections.    Any Participant subject to the Automatic Increase described in Section 3.1(d)(1) or (2) may elect to change the date as of which the increase shall apply to the first day of any month, may elect another whole percentage of increase, which shall be between 1% and 20% of Compensation (or, prior to April 1, 2012, 10% of Compensation), and/or may elect a maximum Elective Deferral Rate that is different from the applicable maximum Elective Deferral Rate under Section 3.1(d)(1) or (2), but not more than 20% of Compensation (or, prior to April 1, 2012, 10% of Compensation). In order to be effective for a Plan Year, such election must be made before the applicable date required under Section 3.1(d)(1) or (2) for electing not to have the Automatic Increase apply. Once an election under this Section 3.1(d)(3) becomes effective, it shall apply for any subsequent Plan Years, unless the Participant changes this election. A Participant who makes an election or changes such election under this Section 3.1(d)(3) shall continue to be subject to the Automatic Increase under Section 3.1(d)(1) or (2) as modified, however, by the Participant's election under this Section.

(e)     Basic Contributions and Additional Contributions.

(1)     "Basic Contributions" means the portion of a Participant's Elective Deferrals that are from 1% up to 6% of Compensation. Basic Contributions will be matched by the Employer pursuant to Section 4.1.

18

(2) "Additional Contributions" means any portion of a Participant's Elective Deferrals that are in excess of 6% of Compensation but not more than 20% of Compensation (or, prior to April 1, 2012, 15% of Compensation).

(3) The Elective Deferral Rate made by a Highly Compensated Employee may, from time to time, be restricted by the Board of Directors of the Company or the Benefits and Investment Committee or (a delegate thereof) in order to comply with the limitations of Section 3.4.

(f) The Employer shall deposit an amount equal to the total amount deferred pursuant to Salary Reduction Agreements under Section 3.1 entered into (or deemed to be entered into pursuant to subsection (c) above) between the Employer and Participants for such Plan Year. Contributions made by the Employer for a given Plan Year pursuant to a Participant's Salary Reduction Agreement (or deemed Salary Reduction Agreement) under Section 3.1 shall be deposited in the Trust not later than the date on which such amounts would be required to be contributed in accordance with applicable law.

3.2 Catch-Up Contributions

Effective as of April 1, 2002, a Participant who (a) is at least age 50 as of the last day of the applicable calendar year; and (b) makes the maximum amount of Elective Deferrals permitted by this Plan (as limited by the provisions of the Code) for the Plan Year shall also be entitled to make Elective Deferrals which are catch-up contributions in accordance with and equal to the maximum amount of contributions permitted under Code Section 414(v) for that Plan Year. The Plan shall not be treated as failing to satisfy those Plan provisions that implement the requirements of Code Section 401(k)(3), 401(k)(11), 401(k)(12), or 410(b) as a result of allowing a Participant to make catch-up contributions under this Section 3.2.

3.3 Changes to Salary Reduction Agreements

A Participant may elect to:

(a) Increase or decrease the Elective Deferral Rate at any time by making a new election in such manner as prescribed by the Benefits and Investment Committee;

(b) Suspend his election to make Elective Deferrals at any time by making an election in such manner as prescribed by the Benefits and Investment Committee.

19

(c)     Recommence his election to make Elective Deferrals to the Plan at any time by making an election in such a manner as prescribed by the Benefits and Investment Committee.  Elective Deferrals shall cease automatically when a Participant ceases to be an Eligible Employee.

Elections for changes in Elective Deferrals will be effective as soon as administratively practicable after the election is made.

3.4  <u>Aggregate Limitation on Elective Deferrals</u>

The Actual Deferral Percentage as defined in subsection 3.4(c) for Participants who are Highly Compensated Employees for any Plan Year shall not exceed the greater of (a) or (b) as follows:

(a)     The Actual Deferral Percentage for the preceding Plan Year of Eligible Participants who are Non-Highly Compensated Employees multiplied by 1.25; or

(b)     The Actual Deferral Percentage for the preceding Plan Year for Eligible Participants who are Non-Highly Compensated Employees multiplied by 2.0; provided however, the Actual Deferral Percentage for Eligible Participants who are Highly Compensated Employees, may not exceed the Actual Deferral Percentage for the prior Plan Year for Eligible Participants who are Non Highly Compensated Employees by more than two (2) percentage points.

(c)     The Actual Deferral Percentage for a specified group of Participants for a Plan Year shall be the average of the ratios (calculated separately) for the Participants in each group of:

(1)     The amount of Elective Deferrals actually paid to the Plan under Section 3.1 on behalf of each such Eligible Employee for such Plan Year (excluding any contributions returned under Section 9.2 and in the case of a Participant who is not a Highly Compensated Employee, contributions returned under Section 3.8.)

(2)     The Participant's 415 Compensation for such Plan Year.

20

(d)    Special Rules

(1)    For purposes of this Article III, the Deferral Percentage for any Highly Compensated Employee for the Plan Year and who is eligible to make Elective Deferrals under two or more plans described in Code Section 401(k) that are maintained by the Employer or an Affiliated Company, shall be determined as if all such Elective Deferrals were made under a single plan.

(2)    In the event that this Plan satisfies the requirements of Code Section 410(b) only if aggregated with one or more plans, or if one or more other plans satisfy the requirements of Code Section 410(b) only if aggregated with this Plan, then this Article III shall be applied by determining the Deferral Percentages of Eligible Employees as if all such plans were a single plan.

(3)    Subject to Section 4.6, the Benefits and Investment Committee may take into account, in computing the numerator of the fraction, any (or all) of a Participant's Qualified Employer Contributions.

(4)    The determination and treatment of the Average Deferral Percentage of any Participant shall satisfy such other requirements as may be prescribed by the Internal Revenue Service.

3.5   Failure to Meet Actual Deferral Percentage Tests

(a)    For each Plan Year, the Employer may in its discretion decide to contribute to the Trust a specified amount of Qualified Employer Contributions. The amount contributed shall be allocated to Participants who satisfy the requirements of Section 4.3(a) and are not Highly Compensated Employees to the extent necessary to satisfy Section 3.4 and 4.6. However, with respect to Plan Years beginning on or after January 1, 2005, any allocation of Qualified Employer Contributions shall be done in accordance with a method that satisfies the requirements of Code Sections 401(k) and (m) and Treas. Reg. Sections 1.401(k)-2(a)(6) and 1.401(m)-2(a)(6).

(b)    In the event that neither Actual Deferral Percentage test is initially satisfied, the Employer shall proceed as provided for in subsection (c) until one of the Actual Deferral Percentage tests of Section 3.4 is met.

21

(c)     Distribute Excess Contributions

If neither Actual Deferral Percentage test is satisfied for a given Plan Year, the Employer shall return (before the close of the following Plan Year) the amount of the Excess Contributions (as defined in subsection (c)(4) below) plus any income attributable to such Excess Contribution. Effective for Plan Years beginning on or after January 1, 1997, the amount of Excess Contributions, plus income, to be returned to Highly Compensated Employees under this subsection (c) shall be determined as follows:

(1)     The Excess Contribution shall be reduced by returning a portion of the Elective Deferrals of the Highly Compensated Employee with the highest dollar amount of Elective Deferrals so that the remaining amount of such Highly Compensated Employee's Elective Deferrals is equal to the amount of the Elective Deferrals of the Highly Compensated Employee with the next highest dollar amount. If the total amount returned in the prior sentence is less than the total Excess Contributions, reductions shall continue to be made in accordance with the prior sentence until the total amount of the reduction equals the total Excess Contributions. In no event shall the amount of a Participant's Elective Deferrals required to be returned when added to the other Elective Deferrals returned under this Section 3.5 exceed the total Excess Contributions.

(2)     The amount of Elective Deferrals to be returned to the Participant under clauses (A) or (B) shall be reduced by the amount of any Elective Deferrals previously returned to him with respect to that Plan Year under Section 3.8.

(3)     In the case of a Participant to whom Basic Contributions are returned under clauses (A) or (B), the amount of his or her Employer Matching Contributions attributable to those Basic Contributions shall be forfeited.

(4)     "Excess Contributions" means the excess of Elective Deferrals on behalf of Highly Compensated Employees, for a given Plan Year, over the maximum permitted under Section 3.4. The amount of a Highly Compensated Employee's Matching Contribution attributable to the Excess Contributions which are returned under this subsection (c) shall be forfeited.

(5)     The amount of a Participant's Elective Deferrals that are returned under this subsection (c) shall be adjusted as determined by the Benefits and Investment

22

Committee for allocable gains and losses (in accordance with Income Tax Regulations under Code Sections 401(k) and 401(m)) for the Plan Year with respect to which the contributions were made.

(6)     Amounts returned to Highly Compensated Employees under this section shall be treated as Annual Additions under Section 9.1.

3.6  Withdrawal and Distribution Restrictions

(a)     A Participant's Elective Deferrals described in Section 3.1 shall not be distributable earlier than:

(1)     The Participant's Severance from Service Date;

(2)     Termination of this Plan without the establishment of a successor plan;

(3)     The attainment by the Participant of age fifty-nine and one-half (59½);

(4)     A hardship for which a withdrawal is permitted as described in Section 7.6;

(5)     With respect to amounts that may be withdrawn under Section 7.7, the date of a withdrawal under Section 7.7; or

(6)     The Participant's qualifying for a Qualified Reservist Distribution (as defined in Section 7.9).

23

3.7  Elective Deferrals - Contribution Limitation

No Participant shall be permitted to have Elective Deferrals made under this Plan, or any other qualified plan maintained by the Employer or an Affiliated Company, during any calendar year, in excess of $17,500 (or such larger dollar amount as is permitted under Code Section 402(g) including such amounts determined by the Internal Revenue Service to reflect increases in the cost of living), except to the extent that such Elective Deferrals are permitted under Section 3.2 of the Plan.

3.8  Distribution of Excess Elective Deferrals

(a)   "Excess Elective Deferrals" shall mean those Elective Deferrals that are includible in a Participant's gross income under Code Section 402(g) to the extent such Participant's Elective Deferrals for a calendar year exceed $17,500, (or such larger dollar amount as is permitted under Code Section 402(g) including such amounts determined by the Internal Revenue Service pursuant to reflect increases in the cost of living) and disregarding contributions made under Section 3.2.

(b)   A Participant may request that the Benefits and Investment Committee distribute to him or her from the Plan any Excess Elective Deferrals made during a calendar year on or before April 15 following the date of the request or the close of the taxable year. A Participant who has contributed Excess Elective Deferrals shall be deemed to have requested a distribution under this Section 3.8(b).

(c)   Excess Elective Deferrals shall be adjusted for income. The income allocable to Excess Elective Deferrals shall be determined in the same manner that the Plan uses to allocate income to the Participant's Elective Deferral Account. The income adjustment shall include income amounts allocable through the end of the Plan Year in which the Excess Elective Deferral was made (or in the case of Excess Elective Deferrals relating to periods prior to January 1, 2008, through the distribution date).

(d)   Notwithstanding any other provisions of the Plan, Excess Elective Deferrals, plus any income allocable thereto, shall be distributed no later than April 15 to any Participant to whose account Excess Elective Deferrals were allocated for the preceding year.

24

3.9 Rollovers

(a)    Upon an Eligible Employee's or (to the extent provided in subsection (c)) Participant's request, the Benefits and Investment Committee, in its discretion, may permit him or her either to contribute a Rollover Contribution to the Trust in cash or have a Rollover Contribution transferred to the Trust in a direct trustee to trustee transfer.  If the Benefits and Investment Committee permits the contribution or transfer, the Rollover Contribution shall be credited to the Eligible Employee's or Participant's Rollover Contribution Account.  No other contributions shall be allocated to the Rollover Contribution Account.

(b)    An Eligible Employee may roll over to this Plan all or any part of an Eligible Rollover Distribution as defined in Code Section 402(c)(4) prior to becoming a Participant.

(c)    Effective December 1, 2010, a former Employee who is a Participant (with a vested Account Balance ) may roll over to this Plan all or any part of an Eligible Rollover Distribution as defined in Code Section 402(c)(4) from a Plan maintained by an Affiliated Company.

**ARTICLE IV**

**EMPLOYER CONTRIBUTIONS**

4.1 Matching Contribution

(a)    For each Eligible Employee who enters into (or is deemed to enter into) a Salary Reduction Agreement under Section 3.1, the Employer shall contribute a Matching Contribution equal to fifty percent (50%) of the Eligible Employee's Basic Contributions as specified in Section 3.1(e) up to a maximum of three percent (3%) of such Eligible Employee's Compensation

(b)    The Employer may make a Matching Contribution on a payroll by payroll basis during the Plan Year, provided that Compensation taken into consideration is based on the Plan Year.  The Employer shall adjust the Matching Contributions throughout the Plan Year and/or at the end of the Plan Year for all Participants so that the Matching Contribution formula in paragraph (a) above considers all Basic Contributions made by the Participant during the Plan Year and is based on the Participant's Compensation for the Plan Year.

25

(c)     The Employer's contributions under this Section 4.1 will be reduced by any available forfeitures occurring pursuant to Sections 4.7, 6.4, 7.13 and/or 9.2.

4.2  <u>Profit Sharing Contribution</u>

Each year the Employer may contribute to the Trust a Profit Sharing Contribution in such amount as shall be determined by its Board of Directors in its discretion.

The Employer's contributions under this Section 4.2 will be reduced by any available forfeitures occurring pursuant to Sections 4.7, 6.4, 7.13 and/or Section 9.2.

4.3  <u>Allocation of Profit Sharing Contribution</u>

The following rules shall apply for purposes of the allocation of Profit Sharing Contributions:

(a)     Only a Participant who at the close of business on the last day of the Plan Year is an Eligible Employee in the employ of the Employer or is on a Leave of Absence shall be entitled to share in the allocation of the Profit Sharing Contribution for that Plan Year.

(b)     If a Participant transfers from employment as an Eligible Employee to employment with an Affiliated Company that does not participate in the Plan, then for the Plan Year in which such transfer occurs, the Participant shall be entitled to receive a Profit Sharing Contribution based on his or her Compensation prior to the transfer, provided the Participant remains in the employ of such Affiliated Company (including a leave of absence) until the last day of such Plan Year.

(c)     The Profit Sharing Contribution made pursuant to Section 4.2 shall be allocated to the Account of each Participant eligible for a Profit Sharing Contribution in the same ratio that each Participant's Compensation during the Plan Year bears to the total of all such Participants' Compensation for such Plan Year.

(d)     Notwithstanding subsection (a) above, no allocation of Profit Sharing Contributions for the 2012 and later Plan Years to a Participant who is a Highly Compensated Employee shall exceed 11% of the Participant's 415 Compensation for such Plan Year, with a Participant's allocation percentage calculated for this purpose by taking into account permitted disparity (determined in accordance with Treas. Reg. Section 1.401(a)(4)-7).

26

### 4.4  Crediting of Forfeitures upon Resuming Employment

If a Participant who incurs a Severance from Service Date and (a) resumes employment with an Employer without having at least five consecutive Breaks in Service and (b) if Section 4.5 applies to the Participant, he or she repays in accordance with Section 4.5 the amount previously distributed to him or her, the amount, if any, of his or her forfeiture under Section 6.4 shall be credited to his or her Profit Sharing Contribution Account and the Matching Contribution Account as soon as possible following the later of the day he or she resumes employment or repays the distribution under Section 4.5.   The amount credited under this Section 4.4 shall be funded first by forfeitures which have not been previously taken into account under this Section 4.4 or Section 4.1 or 4.2 and, if that is insufficient, by contributions by an Employer.

### 4.5  Repayment upon Reemployment after Cash-Out

(a)    If a Participant (1) receives, upon his or her termination a distribution of his or her entire nonforfeitable interest in his or her Account and the amount of that distribution is less than the total amount credited to his or her Account, and (2) subsequently resumes employment with an Employer and becomes a Participant, he or she may repay to the Trust the full amount of the distribution from his or her Profit Sharing Contribution Account and Matching Contribution Account provided that the repayment is made no later than the earlier of (x) five years after resumption of employment and (y) the last day of the first period of five consecutive Breaks in Service beginning after the distribution.

(b)    A Participant who incurs a Severance from Service Date and has no nonforfeitable interest in the credit balances in his or her Account (including his or her Elective Deferral Account, but excluding a nonforfeitable interest attributable solely to his or her Voluntary After-Tax Contribution Account and Rollover Contribution Account) shall be deemed (i) to have received a distribution described in clause (1) of subsection 4.5(a) upon his or her termination and (ii) to have repaid that amount upon his or her subsequent reemployment with an Employer and becoming a Participant.

(c)    The repayment under this Section 4.5 may be made as a cash contribution to the Trust which shall be credited to the Participant's Profit Sharing Contribution Account and

27

Matching Contribution Account, as applicable.  Alternatively, the repayment may be made as a Rollover Contribution and credited to the Participant's Rollover Contribution Account.

    4.6  <u>Limitations on Matching Contributions</u>

        (a)    For the purposes of this Section 4.6, the following terms shall be defined as follows:

        (1)    "Contribution Percentage Amount" shall mean the Matching Contributions made under the Qualified Cash or Deferred Arrangement on behalf of the Eligible Participant for the Plan Year.  Such Contribution Percentage Amounts shall include forfeitures of Excess Aggregate Contributions allocated to the Eligible Participant's Account, which shall be taken into account in the year in which such forfeiture is allocated.

    The Benefits and Investment Committee may elect to take into account in computing the Contribution Percentage Amount any or all of the amount of the Participant's Elective Deferrals and Qualified Employer Contributions for the Plan Year provided that (1) the Average Deferral Percentage for Highly Compensated Employees satisfies Section 3.4 both (i) by taking into account all Elective Deferrals and (ii) by taking into account only Elective Deferrals but excluding those Elective Deferrals taken into account in determining the maximum Average Contribution Percentage for Highly Compensated Employees and (2) those Elective Deferrals and Qualified Employer Contributions taken into account in determining the maximum Average Contribution Percentage for Highly Compensated Employees are not taken into account for determining the maximum Average Deferral Percentage for Highly Compensated Employees.

        (2)    "Contribution Percentage" shall mean the ratio (expressed as a percentage) of the Eligible Participant's Contribution Percentage Amount to the Eligible Participant's 415 Compensation for the Plan Year.

        (3)    "Average Contribution Percentage" shall mean the average (expressed as a percentage) of the Contribution Percentages of the Eligible Participants in a group.

        (b)    The Average Contribution Percentage for Eligible Participants who are Highly Compensated Employees for each Plan Year and the Average Contribution Percentage

US2008 553 US

for Eligible Participants who are Non-Highly Compensated Employees for the Plan Year must satisfy one of the following tests:

(1) The Average Contribution Percentage for Eligible Participants who are Highly Compensated Employees for the Plan Year shall not exceed the Average Contribution Percentage for the preceding Plan Year for Eligible Participants who are Non-Highly Compensated Employees multiplied by 1.25; or

(2) The Average Contribution Percentage for Eligible Participants who are Highly Compensated Employees for the Plan Year shall not exceed the Average Contribution Percentage for the preceding Plan Year for Eligible Participants who are Non-Highly Compensated Employees multiplied by two (2), provided that the Average Contribution Percentage for Eligible Participants who are Highly Compensated Employees does not exceed the Average Contribution Percentage for the preceding Plan Year for Eligible Participants who are Non-Highly Compensated Employees by more than two (2) percentage points.

(c)    Special Rules

(1) For purposes of this Article IV, the Contribution Percentage for any Eligible Participant who is a Highly Compensated Employee for the Plan Year and who is eligible to make employee contributions, or to receive Matching Contributions because of either employee contributions or Elective Deferrals allocated to his or her account under two or more plans described in Code Section 401(a) or arrangements described in Code Section 401(k) that are maintained by the Employer or an Affiliated Company shall be determined as if all such contributions were made under a single plan.

(2) In the event that this Plan satisfies the requirements of Code Section 410(b) only if aggregated with one or more other plans, or if one or more other plans satisfy the requirements of Code Section 410(b) only if aggregated with this Plan, then this Article IV shall be applied by determining the Contribution Percentages of Eligible Participants as if all such plans were a single plan.

(3) The determination and treatment of the Contribution Percentage of any Participant shall satisfy such other requirements as may be prescribed by the Internal Revenue Service.

29

US2008 553.71 75.

4.7  Distribution of Excess Aggregate Contributions

(a)  "Excess Aggregate Contribution" shall mean, with respect to any Plan Year, the excess of:

(1)  The aggregate Contribution Percentage Amounts taken into account in computing the numerator of the Contribution Percentage actually made on behalf of Highly Compensated Employees for such Plan Year, over

(2)  The maximum Contribution Percentage Amounts permitted by the Average Contribution Percentage test (determined by reducing contributions made on behalf of Highly Compensated Employees in order of their Contribution Percentages beginning with the highest of such percentages).

(3)  Notwithstanding any other provision of this Plan, Excess Aggregate Contributions, plus any income allocable thereto, shall be reduced.  The reduction shall be made in accordance with the method described in subsection (a)(2) after reductions are made for Excess Contributions under Section 3.5 and any Matching Contributions attributable to the reduced Excess Contributions.  Matching Contributions reduced under this Section shall be forfeitable if not vested, or if vested, distributed no later than the last day of each Plan Year to Participants to whose Account such Excess Aggregate Contributions were allocated for the preceding Plan Year.

(4)  For each Plan Year, the Employer may in its discretion decide to contribute to the Trust a specified amount of Qualified Employer Contributions.  The amount contributed shall be allocated to Participants who satisfy the requirements of Section 4.3(a) and are not Highly Compensated Employees to the extent necessary to satisfy Section 4.6.  However, with respect to Plan Years beginning on or after January 1, 2005, any allocation of Qualified Employer Contributions shall be done in accordance with a method that satisfies the requirements of Code Sections 401(k) and (m) and Treas. Reg. Sections 1.401(k)-2(a)(6) and 1.401(m)-2(a)(6).

(5)  Method of Reducing Excess Aggregate Contributions

Excess Aggregate Contributions plus income distributed (or forfeited) under subsection (a)(3) shall be distributed (or forfeited) by reducing the Employer

30

Matching Contributions of the Highly Compensated Employees with the highest dollar amount of Employer Matching Contributions to the dollar amount of the Employer Matching Contributions of the Highly Compensated Employee with the next highest dollar amount. If the total amount reduced in the prior sentence is less than the total Excess Aggregate Contributions, reductions shall continue to be made in accordance with the prior sentence until the total amount of the reduction equals the total Excess Aggregate Contributions. In no event shall the amount of a Participant's Employer Matching Contributions required to be reduced when added to the other Employer Matching Contributions distributed under Section 4.7 exceed the total Excess Contributions.

(b)     The Excess Aggregate Contributions shall be adjusted for income. The income allocable to Excess Aggregate Contributions shall be determined in the same manner that the Plan uses to allocate income to the Participant's Matching Contribution Account. The income adjustment shall include income amounts allocable through the end of the Plan Year in which the Excess Aggregate Contributions were made (or in the case of Excess Aggregate Contributions for Plan Years prior to January 1, 2008, through the distribution date).

Forfeitures of Excess Aggregate Contributions shall be applied to reduce Profit Sharing Contributions and/or Matching Contributions provided in Article IV. Amounts distributed to, or forfeited by Highly Compensated Employees under this section shall be treated as Annual Additions under Section 9.1.

4.8  Additional Employer Contributions

The Employer shall make additional Employer Contributions on behalf of Eligible Employees as set forth in Schedule C of the Plan.

## ARTICLE V
## INVESTMENTS

5.1  Investment Fund Elections

The Benefits and Investment Committee shall designate the Investment Funds from time to time that are available under the Plan for the investment of Accounts. Each new Participant may elect, prior to the commencement date of his participation, to have amounts attributable to

contributions made thereafter with respect to such Participant held and invested in one or more of the Investment Funds.

5.2 <u>Investment Fund Election Changes</u>

Each Participant may, at any time, make a revised investment election applicable to his or her future contributions from and after the payroll period beginning as soon as administratively practicable following proper submission of such revised election, subject to limitations as may be determined from time to time by the Benefits and Investment Committee in its sole discretion. After a Participant's death, the Participant's Beneficiary shall have the right to make investment elections with respect to the Participant's Account to the same extent that the Participant had during his life.

5.3 <u>Investment Fund Transfers</u>

Each Participant or Beneficiary (with respect to a deceased Participant) may, at any time, elect to have any portion of the amount credited to his Account reallocated among one or more of the Plan's Investment Funds in whole percentages calculated as of the Valuation Date as soon as administratively practicable following proper submission of such revised election.

5.4 <u>Default Investment Election</u>

The Benefits and Investment Committee shall designate one or more of the Investment Funds as the fund(s) into which Accounts will be invested in the absence of investment elections (the "Default Investment Fund"). In the event a Participant or Beneficiary fails to make an investment election, with respect to all or any portion of his or her Account, the undirected portion shall be invested in the Default Investment Fund. If the Plan discontinues an Investment Fund into which any portion of an Account is invested, such portion of the Account shall be mapped to a successor fund, which may be the Default Investment Fund or such other Investment Fund(s) as determined by the Benefits and Investment Committee, following rules established by the Benefits and Investment Committee for this purpose. The Default Investment Fund is intended to be a qualified default investment alternative within the meaning of Section 404(c)(5) of ERISA. To the extent provided under applicable Department of Labor guidance under Section 404(c)(5), if an Account is invested in the Default Investment Fund pursuant to this Section 5.4, the Participant or Beneficiary will be treated as having exercised control over

32

these assets for purposes of Section 404(c)(1) and the protections described in Section 5.6 shall apply to these amounts.

5.5   Investment Fund Election Procedures.

Participants' or Beneficiaries' investment elections shall be made in a manner approved by the Benefits and Investment Committee.

5.6   Section 404(c) Compliance.

Each Participant or Beneficiary is solely responsible for the investment of his Account, his or her selection of Investment Funds, and for transfers among available Investment Funds, and no Plan fiduciary or other person shall have any liability for any loss or diminution in value resulting from the Participant's or Beneficiary's exercise of such investment responsibility. Because Participants and Beneficiaries control the investment of their Accounts, the Plan is intended to be covered to the maximum extent possible by Section 404(c) of ERISA and related Department of Labor regulations, which provided that Plan fiduciaries may be relieved of liability for any losses that are the result of investment instructions given by a Participant or Beneficiary.

5.7   Valuation of Assets in the Trust Fund

As soon as practicable after each Valuation Date, the Trustee shall make a separate determination of the net value of the assets of each of the funds within the Investment Funds as of that Valuation Date (or if the Valuation Date is not a business day, as of the immediately preceding business day).

5.8   Method of Valuing Non-Cash Assets

In determining the net value of the assets of the Trust Fund, the value of any asset other than cash shall be determined in accordance with the customary method of valuation employed by the Trustee or, if no one method is customarily employed by the Trustee, as follows:

(a)   Any security listed on a national securities exchange shall be valued at its closing price on the Valuation Date and any security traded only in the over-the-counter market shall be valued at the mean of the closing bid and asked prices for the security on the Valuation Date (or if it was not traded or quoted on the Valuation Date, on the most recent day prior to the Valuation Date on which it was traded or quoted), as reported in the Wall Street Journal (or if not

33

reported in the Wall Street Journal, as reported by any recognized broker or dealer regularly trading in that security); and

(b)    Any other assets of the Trust Fund shall be valued at their fair market value as determined by the Trustee, as of the Valuation Date.  The Trustee's determination of the value of any asset shall be conclusive and binding upon all Employers, the Benefits and Investment Committee and all Participants and Beneficiaries.  In making its determination of value, the Trustee may rely upon the opinion of any appraiser or other expert that it believes appropriate to consult.

5.9  Allocation of Net Value

As soon as practicable after each Valuation Date, the Benefits and Investment Committee shall allocate the total net value of the assets of each of the funds in the Investment Funds as determined under Section 5.1, among the Accounts of all Participants as of that date in the respective proportions that the credit balance in each Account that is invested in each of those funds as of the immediately preceding Valuation Date bears to the sum of the credit balances in all Accounts invested in that fund as of that Valuation Date.

## ARTICLE VI
## VESTING

6.1  Service

Service means employment with the Employer as an Employee and includes service with an Affiliated Company. Service of any Employee who is a leased employee within the meaning of Code Section 414(n) of an Affiliated Company will be credited for vesting purposes.

6.2  Determining Vested Percentage

(a)    An Employee's Years of Vesting Service shall be based on the elapsed time method of crediting service.

(b)    For purposes of determining an Employee's nonforfeitable interest in his or her Account, an Employee shall be credited with a number of Years of Vesting Service equal to the number of whole years of the Employee's Period of Service (whether or not consecutive). Fractional Periods of Service shall be aggregated with whole years.  An Employee will also receive credit for any Period of Severance of less than twelve (12) months.  However, in the case

34

US2008 853.175

of an Employee who is hired on or after November 1, 2012 and who has a Break in Service of at least five years, for purposes of determining his nonforfeitable interest in his or her Account attributable to periods prior to such Break in Service, any service after his Reemployment Commencement Date shall be disregarded.

(c)     In the case of an individual who is absent from work for maternity or paternity reasons, the 12-consecutive month period beginning on the first anniversary of the first date of such absence shall not constitute a Break in Service. In addition, in the case of an individual who is absent from work due to a leave which qualifies as a leave under the Family and Medical Leave Act of 1993 such period of leave shall not be included in a Participant's Period of Severance. For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence (1) by reason of the pregnancy of the individual, (2) by reason of the birth of a child of the individual, (3) by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or (4) for purposes of caring for such child for a period beginning immediately following such birth or placement.

6.3  Vested Interest

The following rules shall apply:

(a)     A Participant shall be vested in his or her Profit Sharing Contribution Account and Matching Contribution Account in accordance with the following schedule:

| Years of Vesting Service | Vested Interest |
|---|---|
| Less than 1 year | 0% |
| At least 1 year | 20% |
| At least 2 years | 40% |
| At least 3 years | 60% |
| At least 4 years | 80% |
| At least 5 years or more | 100% |

(b)     All Years of Vesting Service with the Employer shall be counted for purposes of this Section 6.3.

(c)     The Profit Sharing Contribution Account and Matching Contribution Account of any Employee who is a Participant in the Plan at his or her Normal Retirement Date shall be non-forfeitable as of such Normal Retirement Date.

35

(d)     The Elective Deferral Account, the Rollover Contribution Account, the Voluntary After-Tax Contribution Account and the Roth Elective Deferral Account (for a Tradewinds Participant as set forth in Schedule E) shall be non-forfeitable at all times.

(e)     Notwithstanding any other section in this Article VI, if a Participant incurs a Disability while an Employee, he or she shall be fully vested in his or her Profit Sharing Contribution Account and Matching Contribution Account.

(f)     Upon the death of a Participant while an Employee, his or her Profit Sharing Contribution Account and Matching Contribution Account shall be fully vested.

(g)     In the case of a San Pellegrino Participant (or any other individual whose account balance under the San Pellegrino USA, Inc. 401(k) Plan was transferred to this Plan due to the January 1, 1999 merger of the San Pellegrino USA, Inc. 401(k) Plan into this Plan), his or her Merged Plan Accounts shall be non-forfeitable as of January 1, 1999.

(h)     In the case of a Participant who was a participant in the Black Mountain Spring Water 401(k) Savings Plan (the "Black Mountain Plan") and who had at least three years of vesting service under the Black Mountain Plan as of December 31, 2001, his or her Merged Plan Accounts shall be non-forfeitable as of January 1, 2002.

(i)     In the case of a Black Mountain Livermore Union Employee, his or her Merged Plan Accounts shall be non-forfeitable as of April 1, 2002.

(j)     In the case of an individual whose account balance under the Tradewinds Plan was transferred to this Plan as a result of the April 1, 2012 merger of the Tradewinds Plan into this Plan, his or her Merged Plan Accounts shall be non-forfeitable as of April 1, 2012.

(k)     In the case of an individual whose account balance under the Sweet Leaf Tea Plan was transferred to this Plan as a result of the June 1, 2012 merger of the Sweet Leaf Tea Plan into this Plan, his or her Merged Plan Accounts shall be non-forfeitable as of June 1, 2012.

6.4   Forfeiture of Nonvested Interests

Except as otherwise provided in this Article VI, when a Participant incurs a Severance from Service Date, the unvested portion of his or her Account Balance shall be forfeited as of the earliest to occur of the following: (a) the date as of which the vested portion of the Participant's Account Balance is distributed pursuant to Article VII, (b) in the case of a Participant described

36

in Section 4.5(b) the Severance from Service Date, or (c) in the case of a Participant who is hired on or after November 1, 2012 and is not described in Section 4.5(b), as of the date the Participant incurs a Break in Service of five (5) years. Forfeitures arising under this Section 6.4 shall be treated in accordance with the applicable Plan provisions relating to forfeitures.

## ARTICLE VII
## DISTRIBUTION OF BENEFITS

### 7.1 Distribution of Benefits on Account of Termination of Service

(a)     Subject to the provisions of this Section 7.1, a Participant who incurs a Severance from Service Date before his or her Normal Retirement Date and who has a vested Account Balance which exceeds $5,000 as of the Valuation Date that is the 45th day following a Participant's Severance from Service Date may elect to have distribution of his or her vested Account Balance commence as of a date which is at least 45 days after his or her Severance from Service Date, but not later than the April 1st following his or her attainment of age 70½ (age 65, in the case of a Participant who both terminated service and attained age 65 before January 1, 2008). A Participant's distribution shall commence as soon as practicable after the date elected, in the form elected under Section 7.4. Subject to the following sentence, a Participant's distribution shall not commence before the Participant submits a distribution election form. Notwithstanding any other language in this Plan, in no event shall a Participant's distribution commence later than his or her Required Beginning Date under Section 7.5. If the Participant does not elect to receive a distribution on or before his or her Required Beginning Date, then payment of his or her distribution shall automatically be made in accordance with Section 7.5.

(b)     A Participant will be given a notice of his or her right to make an election under this Section 7.1 and Section 7.2 within the period beginning no earlier than 180 days before the date the distribution is to commence and no later than 30 days before that date. The Participant's election must be made at least 30 days after the notice, unless the Participant has received notice of his or her right to have at least 30 days to review this notice before making an election and the Participant makes an affirmative election before the expiration of the 30 days. If a Participant elects a distribution prior to the expiration of the 30-day period the election will not be effective until at least 7 days after the Participant has received the notice and the Participant must

37

acknowledge that he or she has been informed of the right to have at least 30 days to consider this notice.

    (c)    Notwithstanding subsection (a), if the Participant's vested Account Balance is $5,000 or less as of the Valuation Date that is the 45th day following a Participant's Severance from Service Date, the Trustee shall cash out the full amount of the Participant's vested Account Balance as soon as practicable after such Valuation Date. If a Participant's vested Account Balance to be cashed out pursuant to the preceding sentence is more than $1,000 and the Participant does not specifically elect within the applicable election period to have his or her distribution paid as a direct transfer (as provided in Section 7.10) or paid as a cash distribution, then except for distributions pursuant to Sections 7.2 and 7.3 or as otherwise prohibited by applicable laws, the distribution shall be made as a direct rollover to an individual retirement plan designated by the Benefits and Investment Committee.

    (d)    Subject to Section 7.5 and subsection (c) above, if a Participant incurs a Severance from Service Date, his or her Account Balance which is vested at his or her Severance from Service Date shall be paid to the Participant no later than the sixtieth (60th) day after the close of the Plan Year in which the latest of the following events occurs: (1) the Participant's Normal Retirement Date, had his or her employment not been so terminated; (2) the tenth (10th) anniversary of the Participant's entry into the Plan; (3) the Participant's Severance from Service Date; or (4) a later date specified in an election made by the Participant.

7.2  Distribution of Benefits at Normal Retirement Date or Late Retirement Date

    Subject to the provisions of Section 7.5, upon a Participant's termination of service on or after the Participant's Normal Retirement Date, the Trustee shall pay the Account Balance to the Participant valued as of the Valuation Date coincident with or following the Participant's Normal Retirement Date or Late Retirement Date in the form elected by the Participant under Section 7.4. If a Participant has a termination of employment with all Affiliated Companies on or after his or her Normal Retirement Date and on or after January 1, 2008 and has a vested Account Balance which exceeds $5,000, then the Participant may elect to defer commencement of his or her distribution and elect a distribution date which is not later than the April 1st following the Participant's attainment of age 70½. In the event that the Participant elects to defer his or her distribution under this Section 7.2, then his or her distribution shall be paid as soon as practicable

38

after the date elected in the form elected under Section 7.4. Subject to the following sentence, a Participant's distribution will not commence before the Participant submits a distribution election form. Notwithstanding any other language in this Plan, in no event shall a Participant's distribution commence later than his or her Required Beginning Date under Section 7.5. If the Participant does not elect to receive a distribution on or before his Required Beginning Date, then payment of his or her distribution shall automatically be made in accordance with Section 7.5. The Participant's election of a specific commencement date and form of distribution under the foregoing provisions of this Section 7.2 must be made within the time period provided in subsection 7.1(b).

### 7.3   Election/Payment upon Death

If a Participant who is an Employee dies before his or her entire Account Balance is distributed, the Participant's Account Balance shall become non-forfeitable and shall be payable to his or her Beneficiary or if the Participant has not designated a Beneficiary or if the Beneficiary does not survive the Participant, to the Participant's surviving Spouse, or if the Participant had not designated a Beneficiary and has no surviving Spouse, to his or her estate or legal representative.

The Trustee shall pay the Account Balance valued as of the Valuation Date coincident with or following the Participant's date of death.

### 7.4   Form of Payments

Subject to Sections 7.5 and 7.10, Schedule D and applicable law, a Participant who incurs a Severance from Service Date and who has a vested Account Balance which exceeds $5,000 may elect to receive his distribution in the form of:

(a)   A single lump sum cash distribution;

(b)   Monthly, quarterly, semi-annual or annual installment payments over a period selected by the Participant;

(c)   A withdrawal of all or a portion of his or her Account Balance; or

(d)   In the case of a Participant who elects to defer distribution of his or her vested Account Balance to his or her Required Beginning Date, distribution amounts equal to the Required Minimum Distributions under Section 7.5.

39

US2008 5537153 .

7.5 <u>Minimum Distribution Requirements</u>

(a)     In no event shall distributions commence later than the Participant's first Required Beginning Date.  With respect to each calendar year beginning with the Participant's Required Beginning Date and ending on the date of the Participant's death (or, if earlier, the date the Participant's entire vested interest has been distributed) the Participant shall receive a distribution which is at least equal to the minimum distribution amount as determined under subsection 7.5(b).  Notwithstanding the preceding sentence, a Participant or Beneficiary who would have been required to receive required minimum distributions for 2009, but for the enactment of Code Section 401(a)(9)(H) thereof ("2009 RMDs"), and who would have satisfied that requirement by receiving distributions that are equal to the 2009 RMDs shall not receive any such 2009 RMDs, unless the Participant or Beneficiary requests receipt of those 2009 RMDs in accordance with Code Section 401(a)(9)(H).  Any payment of 2009 RMDs described in the preceding sentence will be treated as an eligible rollover distribution.

(b)     The "minimum distribution amount" for each calendar year shall be an amount equal to the Participant's vested interest (determined as of the last day of the calendar year preceding the calendar year with respect to which the distribution is being made) divided by the applicable life expectancy.  The applicable life expectancy shall be the greater of (1) the distribution period in the Uniform Lifetime Table set forth in Treas. Reg. Section 1.401(a)(9)-9, using the Participant's age as of his most recent birthday in the year in which the Participant attained age 70½, and (2) in the case of a Participant whose sole Beneficiary is his Spouse, the distribution period in the Joint and Last Survivor Table set forth in Treas. Reg. Section 1.401(a)(9)-9 using the Participant's (and the Spouse's) attained age as of the Participant's most recent birthday (and the Spouse's most recent birthday) in the year in which the Participant attains age 70-1/2.  The life expectancy of the Participant and his Spouse shall not be recalculated annually after it has been determined under the previous sentence.

(c)     Any distribution under subsection 7.5(b) shall also satisfy the minimum distribution incidental benefit requirement of Code Section 401(a)(9)(G) and Treas. Reg. Section 1.401(a)(9)-2.

(d)     If the Participant dies before distribution of his or her benefits commence, the Participant's entire interest will be distributed no later than the December 31st of the calendar

40

year containing the fifth anniversary of the Participant's death.  In the event that the five-year period in the preceding sentence includes 2009, then as a result of the 2009 RMD waiver rules, the five-year period is extended by one year.

(e)     In the case of a Participant who dies after distribution of his or her vested interest has commenced, the remaining portion of his or her vested interest shall be distributed to the Participant's Beneficiary at least as rapidly as would have been distributed under the method of distribution in effect on the day of the Participant's death and in no event shall the Beneficiary receive less than the minimum distribution amount in each year for which a distribution is required.  For this purpose the minimum distribution amount shall be equal to the remaining portion of the Participant's vested interest (determined as of the last day of the calendar year with respect to which the distribution is being made) divided by the greater of (1) the Participant's remaining Life Expectancy under the Joint and Last Survivor Table set forth in Treas. Reg. Section 1.401(a)(9)-9 as of the Participant's age in the year of death and reduced by one for each subsequent year or (2) in the case of a Participant who has a Beneficiary designated by the September 30th of the calendar year following the Participant's death, the Beneficiary's Life Expectancy under the Single Life Table in Section 1.401(a)(9)-9 based on the age of the Beneficiary in the year following the year of the Participant's death reduced by one for each subsequent year.  If the Participant's Spouse is the sole Beneficiary then for the year after the Spouse's death, the remaining life expectancy of the Spouse shall be calculated based on the Spouse's age as of her death and shall be reduced by one for each subsequent year.

(f)     Definitions - For purpose of this Section 7.5, the following terms are defined as follows:

(1)     "Required Beginning Date" means April 1st of the calendar year following the later of the calendar year in which the Participant retires or the calendar year in which the Participant attains age 70-1/2, and (ii) in the case of a Participant who is a Five Percent (5%) Owner, the April 1st following the calendar year in which the Participant attains age 70-1/2 (but not earlier than the date the Participant becomes a 5% Owner).

(2)     "Five Percent (5%) Owner" means a person described in Code Section 416(i) during any Plan Year which ends within the calendar year in which such individual attains the age of 66½ or any later Plan Year.

41

**7.6** Hardship Withdrawals

     (a)    A Participant who is an Employee (or, effective January 1, 2012, an employee of an Affiliated Company) and has not attained age 59½ may apply in such manner as prescribed by the Benefits and Investment Committee for a hardship withdrawal at any time. The withdrawal must be for an immediate and heavy financial need of the Participant for which funds are not reasonably available from other resources of the Participant. The amount of the withdrawal must be at least $500 and a Participant may not make more than four hardship withdrawals in any one Plan Year (or such other limit as established by the Benefits and Investment Committee). In addition, such withdrawal shall be limited to the aggregate of the sum of the amounts described in the following sentence reduced by the amount of any outstanding loan balance (as described in Article VIII). The limitations are the (1) Participant's Elective Deferrals (described in Section 3.1 excluding any earnings attributable to the Elective Deferrals), (2) vested portion of the Participant's Profit Sharing Contribution Account, (3) vested portion of the Participant's Matching Contribution Account, and (4) vested portion of the Participant's Account Balances attributable to any additional Employer Contributions made pursuant to Section 4.8 which are not already included in clauses (1) through (3). In addition, the amount of the withdrawal shall not exceed the amount of the Participant's immediate and heavy financial need. The determination of the existence of financial hardship and the amount required to be distributed to meet the need created by the hardship must be made in a uniform and nondiscriminatory manner. In determining the amount of an immediate and heavy financial need, the Benefits and Investment Committee may take into account any amounts necessary to pay any federal, state or local income taxes (and related penalty taxes, such as Code Section 72(t)) if so requested by the Participant.

     (b)    For purposes of Section 7.6(a), a Participant is deemed to have an immediate and heavy financial need only if the distribution is for one or more of the following:

     (1)    Tuition expenses and related educational fees for the next twelve months of post-secondary education for the Participant or the Participant's Spouse, children or dependents (as defined in Code Section 152, and, for taxable years beginning on or after January 1, 2005, without regard to Code Sections 152(b)(1), (b)(2) and (d)(1)(B)) or effective January 1, 2010, a Participant's Beneficiary under this Plan;

42

       (2)     Unreimbursed medical expenses described in Code Section 213 previously incurred by the Participant, his or her Spouse, children or dependents (as defined in Code Section 152, and, for taxable years beginning on or after January 1, 2005, without regard to Code Sections 152(b)(1), (b)(2) and (d)(1)(B)) or effective January 1, 2010, a Participant's Beneficiary under this Plan; or unreimbursable medical expenses described in Code Section 213 necessary for such persons to obtain medical care;

       (3)     The purchase (excluding mortgage payments) of the Participant's principal residence;

       (4)     Payments necessary to prevent the eviction from the Participant's principal residence or foreclosure on the mortgage of the Participant's principal residence;

       (5)     Effective as of January 1, 2006, expenses for the repair of damage to the Participant's principal residence that would qualify for the casualty deduction under Code Section 165 (determined without regard to whether the loss exceeds 10% of adjusted gross income); or

       (6)     Effective as of January 1, 2006, burial or funeral expenses for the Participant's deceased parent, Spouse, children or dependents (as defined in Code Section 152, and without regard to Code Section 152(d)(1)(B)) or effective January 1, 2010, a Participant's Beneficiary under this Plan;

       (7)     To the extent not inconsistent with the specified provisions of this Section 7.6(b), any other type of financial hardship designated by the Internal Revenue Service through the publication of documents of general applicability in accordance with Treas. Reg. Section 1.401(k)-1(d))(3)(v).

       (c)     In the event of such hardship withdrawal, the Participant shall be suspended from making Elective Deferrals or any elective or employee contributions to any other qualified plan or non-qualified plan (including stock option, stock purchase plans or similar plans, but not including mandatory employee contributions to a defined benefit plan or contributions to a health or welfare benefit plan) for a period of six months. As soon as practicable on or after 30 days following the end of the six-month suspension period, the Participant's Elective Deferrals under the Plan shall automatically be reinstated at the percentage

43

of Elective Deferrals that was being contributed by the Participant immediately before his hardship withdrawal, unless the Participant makes an election within such 30-day period not to have such reinstatement apply.

   (d) If the Participant has invested in more than one Investment Fund, the amount of the withdrawal will be taken pro rata from each of the relevant Investment Funds.

   (e) The withdrawal shall be paid to the Participant as of the Valuation Date coincident with or next following the date the Participant's request is approved by the Benefits and Investment Committee.

   (f) Prior to requesting a hardship withdrawal, the Participant must first request a withdrawal under Section 7.7, if eligible and must take all nontaxable loans under Section 8.1 and under any other plan maintained by the Employer or an Affiliated Company whether or not qualified under Code Section 401(a).

 7.7 Withdrawal of Rollover Contribution Account and Certain Voluntary Contributions

   (a) A Participant may withdraw all or any portion of his Rollover Contribution Account.

   (b) A Voluntary After-Tax Contribution Account shall be established for Participants who participated in the Arrowhead Water Corp. Individually Vested Employee Savings Trust who had an account balance thereunder attributable to voluntary contributions under the Beatrice Beverage Employee Savings Trust to hold such voluntary contributions. Such Participants may withdraw all or any portion of their Voluntary-After Tax Contributions Account.

   (c) The following additional rules shall apply to withdrawals under this Section 7.7:

    (1) A Participant may apply at any time, in such a manner as the Benefits and Investment Committee may prescribe, to withdraw the amounts permitted to be withdrawn under subsection (a) or (b) of this Section 7.7. The withdrawal shall be paid to the Participant as of the Valuation Date coincident with or next following the date such request is submitted to the Benefits and Investment Committee.

44

LN2008.53.371.3

(2)    If the Participant has invested in more than one Investment Fund, the amount of the withdrawal will be taken pro rata from each of the relevant Investment Funds.

(3)    For periods prior to April 1, 2012, no withdrawal may be made under this Section if the Participant has made a previous withdrawal under this Section (or corresponding provisions of the plan as in effect on December 31, 1988) during the six month period ending on the date of the subsequent application for a withdrawal.

7.8  Withdrawal of Benefits for Employees Age 59½

A Participant who is age 59½ and who is an Employee (or an employee of an Affiliated Company) may elect to withdraw all or a portion of his or her vested Account Balance in such a manner as the Benefits and Investment Committee may prescribe.  The Trustee shall pay the Account Balance as soon as possible as of the Valuation Date coincident with or next following the Participant's election under this Section 7.8.

7.9  Qualified Reservist Distribution

The Plan permits a Participant to elect a Qualified Reservist Distribution.  A "Qualified Reservist Distribution" is any distribution to a Participant who is ordered or called to active duty after September 11, 2001, if (a) the distribution is from amounts attributable to Pre-Tax Contributions (including Roth Contributions) under the Plan; (b) the Participant was (by reason of being a member of a reserve component, as defined in Section 101 of title 37, United States Code) ordered or called to active duty for a period in excess of 179 days or for an indefinite period; and (c) the Plan makes the distribution during the period beginning on the date of such order or call and ending at the close of the active duty period.  If a Participant obtains such a withdrawal, he or she may repay all or a portion of such amount to the Plan at any time during the two-year period following return from active duty.

7.10  Direct Transfer

Subject to the rules set forth below and Section 7.1(c), a Participant who receives distribution of his or her vested Account Balance in a form which qualifies as an eligible rollover distribution (as defined in Code Section 401(a)(31)) may elect, at the time and in the manner prescribed by the Benefits and Investment Committee, to have all or any portion of that distribution paid directly to any eligible retirement plan (as defined in Code Section

45

402(c)(8)(B)). For purposes of the prior sentence a distribution that is a hardship distribution shall not qualify as an eligible rollover distribution. Effective for distributions made after December 31, 2007, an eligible retirement plan also includes a Roth IRA described in Code Section 408A(b). This direct transfer option shall apply only to a Participant, his or her surviving Spouse, or his or her former Spouse who is entitled to a distribution under the Plan as an alternate payee under a qualified domestic relations order as defined in Code Section 414(p) or, a nonspousal beneficiary to the extent provided in the following sentence. Effective with respect to distributions made on or after May 26, 2009, the direct transfer options shall also apply to a nonspousal beneficiary who is the Participant's designated beneficiary within the meaning of Code Section 401(a)(9), if a direct transfer is made to individual retirement account described in Code Section 408(a) or an individual retirement annuity described in Code Section 408(b) that was established for the purpose of receiving the distribution on behalf of such nonspousal distributee. In order for such eligible retirement plan to accept a nonspousal rollover on behalf of a nonspousal distributee, (1) a direct trustee-to-trustee transfer must be made to an individual retirement plan described in Code Section 7701(a)(37) and shall be treated as an eligible rollover distribution for purposes of the Code, (2) the individual retirement plan shall be treated as an inherited individual retirement account or individual retirement annuity (within the meaning of Code Section 408(d)(3)(C)) for purposes of the Code, and (3) Code Section 401(a)(9)(B) (other than clause (iv) thereof) shall apply to such plan. Any nonspousal rollover shall be made in accordance with the Pension Protection Act of 2006, Internal Revenue Service Notice 2007-7 and any subsequent guidance, and any such distributions made before January 1, 2010 shall not be subject to the rollover requirements of Code Section 401(a)(31), the notice requirements of Code Section 402(f) or the mandatory withholding requirements of Code Section 3405(c).

The following rules shall apply with respect to direct transfers under this Section 7.10:

(a)     A Participant (or Spouse) may not divide his or her eligible rollover distribution into separate distributions to be transferred to two or more eligible retirement plans.

(b)     A Participant's (or Spouse's) election to make or not make a direct rollover with respect to one payment in a series of periodic payments which qualify as an eligible rollover distribution shall apply to all subsequent payment in the series unless the Participant elects otherwise.

46

(c)    If a Participant does not make an election with respect to an eligible rollover distribution by the first date as of which distribution of benefits is to begin, he or she will be treated as not having elected a direct transfer under this Section 7.10.

### 7.11   Payment for Benefit of Incapacitated Person

Whenever, in the opinion of the Benefits and Investment Committee or its agent, a person entitled to receive any payment of a benefit hereunder is incapacitated, is legally incompetent or is unable to manage his financial affairs, the Benefits and Investment Committee or its agent may direct the Trustee to make payments to such person or to his legal representative or, at the direction of the Participant, to a relative or friend of such person for his benefit, or the Plan Administrator or its agent may direct the Trustee to apply the payment for the benefit of such person in such manner as the Plan Administrator or its agent considers advisable.  Any payment of a benefit or installment thereof in accordance with the provisions of this section shall be a complete discharge of any liability for the making of such payment under the provisions of the Plan.

### 7.12   No Other Benefits or Withdrawals

Except as expressly provided for in this Article VII or an Appendix, no individual, whether a Participant, former Participant, Beneficiary or otherwise, shall be entitled to any distribution or withdrawal of funds from the Trust Fund.

### 7.13   Lost Participant or Beneficiary

If the Benefits and Investment Committee, after the passage of a period of time (which period shall be established by the Benefits and Investment Committee in accordance with reasonable administrative practices) and reasonable due diligence is unable to locate an inactive Participant or Beneficiary to whom a payment is due under this Article VII, the amount of the Account due to such person shall be treated as a forfeiture hereunder, provided that any such forfeited benefits shall be subject to reinstatement if the inactive Participant or Beneficiary ever makes a valid claim for the benefit.  If a claim is made for a benefit that was forfeited under this Section 7.13, the benefit to be restored shall be the dollar value of the Account Balance that was forfeited, determined as of the date the forfeiture occurred without any interest, earnings or adjustments in value occurring after the date for forfeiture.  This Section 7.13 shall be

47

administered by the Benefits and Investment Committee in accordance with any restrictions mandated by law.

7.14   Errors in or Overpayments from Participant Accounts

When an error or omission is discovered in an Account of a Participant, the Benefits and Investment Committee and the Trustee shall be authorized to make such equitable adjustments as may be appropriate as of the Plan Year in which the error or omission is discovered.   Any payment from a Participant's Account is subject to the limitation and recovery provisions of Section 16.7.

# ARTICLE VIII
## LOANS

8.1   Rules for Participant Loans

(a)      The Benefits and Investment Committee, upon receipt of written application from the Participant or former Participant who is a Party in Interest (within the meaning of Section 3(14) of ERISA), in accordance with rules it shall establish ("Plan Loan Policy"), may direct the Trustee to make a loan to a Participant or to a former Participant who is a Party in Interest (within the meaning of Section 3(14) of ERISA).

(b)      All loans shall comply with the following terms and conditions:

(1)      Loans shall be made available to all eligible borrowers described in Section 8.1(a) on a reasonably equivalent basis.

(2)      Loans must be adequately secured and bear a reasonable interest rate as determined from time to time by the Benefits and Investment Committee.

(c)      The loan terms shall be made in accordance with the Plan Loan Policy, which is incorporated herein by reference and shall include all required provisions for the Benefits and Investment Committee to administer loans hereunder in compliance with applicable rules under the Code and ERISA, including the following:

(1)      Loan application procedures, including any applicable fees or charges;

(2)      The basis for approving or denying loans;

48

(3)    Any minimum or maximum loan amounts;

(4)    Any other limitations on loan types or amounts;

(5)    Procedures for determining a reasonable rate of interest;

(6)    The types of collateral that may secure loans;

(7)    Permissible repayment terms (including repayment periods and methods); and

(8)    The events constituting default and the steps that will be taken to preserve Plan assets in the event of such default.

## ARTICLE IX
## LIMITATIONS ON CONTRIBUTIONS AND BENEFITS

9.1  Definitions

For purposes of this Article IX, the following terms shall be defined as follows:

(a)    "Annual Additions" – The sum of the following amounts allocated on behalf of a Participant for a Limitation Year:

(1)    All Employer contributions,

(2)    All forfeitures,

(3)    All Participant contributions,

(4)    All contributions after March 31, 1984 to an individual medical benefit account, as defined in Code Section 415(l)(1), which is part of a defined benefit plan maintained by the Employer, and amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, which are attributable to post-retirement medical benefits allocated to the separate account of a Key Employee, under a welfare benefit fund, as defined in Code Section 419(e), maintained by the Employer; and

(5)    Corrected (distributed) Excess Contributions under Section 3.5(c) and corrected (distributed) Excess Aggregate Contributions under Section 4.7.

For purposes of this Article IX, amounts reapplied to reduce Employer contributions under subsection 9.2(a)(2) shall also be included as Annual Additions. Notwithstanding the

49

foregoing, Annual Additions shall not include amounts excluded from the definition of Annual Additions by Treas. Reg. Section 1.415(c)-1(b).

(b) "Excess Amount" means the value of the excess of Annual Additions to a Participant's Account for the Limitation Year over the Maximum Permissible Amount.

(c) "Maximum Permissible Amount" means the lesser of (1) $52,000 (as adjusted for the cost of living under Code Section 415(d)), or (2) 100 percent of the Participant's 415 Compensation for the Limitation Year. If a short Limitation Year is created because of an amendment changing the Limitation Year to a different 12-consecutive month period, the Maximum Permissible Amount will not exceed $52,000 (as adjusted for the cost of living under Code Section 415(d)) multiplied by the following fraction: Numerator of which is the Number of months in the short Limitation Year and the denominator of which is 12. The 100 percent of 415 Compensation limit referred to in clause (2) shall not apply to any contribution for medical benefits after separation from service (within the meaning of Code Section 401(h) or 419A(f)(2)) which is otherwise treated as an Annual Addition.

9.2 <u>Limitation on Annual Additions to Participants' Accounts</u>

(a) The amount of Annual Additions which may be credited to the Participant's Account for any Limitation Year will not exceed the lesser of the Maximum Permissible Amount or any other limitation contained in this Plan.

For Limitation Years beginning prior to January 1, 2008, if there is an Excess Amount, the excess will be disposed of as follows:

(1) Any non-deductible voluntary employee contributions, or Elective Deferrals, to the extent they would reduce the Excess Amount, will be returned to the Participant;

(2) If after the application of Section 9.2(a)(1) an Excess Amount still exists, and the Participant is covered by the Plan at the end of the Limitation Year, the Excess Amount in the Participant's Account will be used to reduce Employer contributions (including any allocation of forfeitures) for such Participant in the next Limitation Year, and each succeeding Limitation Year, if necessary.

US2008 5537125

(3)      If after the application of Section 9.2(a)(1) an Excess Amount still exists, and the Participant is not covered by the Plan at the end of the Limitation Year, the Excess Amount will be held in the Unallocated Suspense Account.  The amount in the Unallocated Suspense Account will be applied to reduce future Employer contributions (including allocation of any forfeitures) for all remaining Participants in the next Limitation Year, and each succeeding Limitation Year, if necessary.

(4)      If the Unallocated Suspense Account is in existence at any time during the Limitation Year pursuant to this Section, it will not participate in the allocation of the Trust's investment gains and losses.

(b)      Effective for Limitation Years beginning on or after January 1, 2008, if there is an Excess Amount, it shall be corrected in accordance with the Employee Plans Compliance Resolution System, as set forth in Revenue Procedure 2008-50 or any superseding guidance, including, but not limited to, the preamble of the regulations issued under Code Section 415.

(c)      All defined benefit plans (whether or not terminated) of the Employer or an Affiliated Company shall be treated as a single defined benefit plan for purposes of this Article IX.

All defined contribution plans (whether or not terminated) of the Employer or an Affiliated Company shall be treated as a defined contribution plan for purposes of this Article IX.

(d)      Special Rules.  The limitations of this Section 9.2 shall be determined and applied taking into account the rules in Treas. Reg. Section 1.415(f)-1.

## ARTICLE X
## TOP-HEAVY RULES

10.1 Definitions

For purposes of this Article X, the following terms shall be defined as follows:

(a)      "Determination Date" means for any Plan Year after the first Plan Year, the last day of the preceding Plan Year, and for the first Plan Year, the last day of that year.

(b)     "Permissive Aggregation Group" means the Required Aggregation Group of plans plus any other plan or plans of the Employer which, when considered as a group with the Required Aggregation Group, would continue to satisfy the requirements of Code Sections 401(a)(4) and 410.

(c)     "Present Value" means a benefit of equivalent value and shall be based on actuarial equivalence assumptions specified in the defined benefit plan.

(d)     "Required Aggregation Group" means (1) each qualified plan of the Employer in which at least one Key Employee participates, and (2) any other qualified plan of the Employer which enables a plan described in this subsection (d) to meet the requirements of Code Sections 401(a)(4) and 410.

(e)     "Top-Heavy Plan" means for any Plan Year beginning after December 31, 1983, this Plan, if any of the following conditions exists:

(1)     If the Top-Heavy Ratio for this Plan exceeds sixty percent (60%) and this Plan is not part of any Required Aggregation Group or Permissive Aggregation Group of Plans.

(2)     If this Plan is a part of a Required Aggregation Group of plans but not part of a Permissive Aggregation Group and the Top-Heavy Ratio for the Required Aggregation Group exceeds sixty percent (60%).

(3)     If this Plan is a part of a Required Aggregation Group and part of a Permissive Aggregation Group of plans and the Top-Heavy Ratio for the Permissive Aggregation Group exceeds sixty (60%) percent.

(f)     "Top-Heavy Ratio" means, as of the Determination Date, a fraction the numerator of which is the sum of the aggregate of the accounts of Key Employees under this Plan and all other defined contribution plans included in the Permissive Aggregation Group and the Present Value of the cumulative accrued benefits of Key Employees under all defined benefit plans included in the Permissive Aggregation Group, and the denominator of which is a similar sum determined for all employees.

All distributions made during the one-year period (five-year period, in the case of distributions made other than as a result of severance from employment, disability or death) ending

52

on the most recent Determination Date must be taken into account. The prior sentence shall also apply to distributions under a terminated plan which, had it not been terminated would have been aggregated with a plan under Code Section 416(g)(2)(A)(i). Nondeductible Voluntary Employee contributions are to be included in determining Top-Heavy Ratios. For plan years beginning after December 31, 1984, any Accrued Benefit or Account Balances of an individual who has not performed services for the Employer during the one year period ending on the Determination Date shall not be taken into account. The Account Balances and Accrued Benefits of former Key Employees who are now Non-Key Employees are excluded entirely from both the numerator and denominator of any fraction used to determine the Top-Heavy Ratio.

10.2  Minimum Contributions

(a)     Except as otherwise provided in subsection (c) for any Plan Year in which the Plan is a Top-heavy Plan, the Employer contributions and forfeitures allocated on behalf of any Participant who is not a Key Employee shall not be less than the lesser of (1) three percent (3%) of such Participant's 415 Compensation, or (2) in the case where the Employer has no defined benefit plan which designates this Plan to satisfy Code Section 401, the largest percentage of Employer contributions and forfeitures allocated on behalf of any Key Employee for that year expressed as a percentage of the first $260,000 of the Key Employee's 415 Compensation. Employer matching contributions shall be taken into account for purposes of satisfying the minimum contribution requirements of Code Section 416(c)(2) and the Plan. Amounts contributed pursuant to a Salary Reduction Agreement must be included in determining the amount contributed on behalf of a Key Employee when the minimum contribution will be less than 3%. The minimum contribution shall be made even though, under the Plan provisions, the Participant would not otherwise be entitled to receive such contribution, or would have received a lesser allocation for the year because of (1) the Participant's failure to complete one thousand (1,000) Hours of Service, or (2) the Participant's failure to make mandatory contributions to the Plan, or (3) the Participant's receipt of 415 Compensation less than a stated amount.

(b)     The requirements of subsection (a) shall not apply to any Participant who was not employed by the Employer on the last day of the Plan Year.

53

## ARTICLE XI
## ADMINISTRATION

### 11.1  The Benefits and Investment Committee

The Benefits and Investment Committee shall be the "named fiduciary" of the Plan as defined in Section 402 of ERISA, and such members severally and not individually shall have authority to control and manage the operation and administration of the Plan.  The Benefits and Investment Committee shall consist of such members appointed by the Board of Directors of the Company from time to time, which shall generally include the Company's General Counsel, Executive Vice President of Human Resources and Chief Financial Officer.  Additional members may also be appointed by the Board of Directors at the Board's discretion.  Any member of the Benefits and Investment Committee may resign at any time by notice to the secretary of the Company or be removed at any time (with or without cause) by the Board of Directors of the Company.

### 11.2  The Trustee

The Trustee (who shall be appointed by the Benefits and Investment Committee) shall have the authority to hold and to manage the assets of the Trust Fund as provided by Article XII.  The Trustee may designate agents or others to carry out certain of the administrative responsibilities in connection with management of the Trust.

### 11.3  Other Fiduciaries.

The Benefits and Investments Committee may from time to time allocate fiduciary responsibilities among its members and may designate persons other than its members to carry out fiduciary responsibilities under the Plan, and such persons shall be deemed to be fiduciaries under the Plan with respect to such delegated responsibilities, but only with respect to such delegated fiduciary responsibilities.  Fiduciaries may employ one or more persons to render advice with regard to any responsibility such fiduciaries have under the Plan.

### 11.4  Decisions and Actions of the Benefits and Investment Committee

The Benefits and Investment Committee from time to time may establish rules for the administration of this Plan.  The Benefits and Investment Committee shall have the sole discretion to make decisions and take any other actions with respect to questions arising in

54

| LS2008 55371 5

connection with the Plan, including the interpretation and construction of the Plan and the Trust. The decisions and actions of the Benefits and Investment Committee as to any questions arising in connection with the Plan, including the construction and interpretation of the Plan and the Trust, shall be final and binding upon all Employees, Participants and Beneficiaries. In all instances the Benefits and Investment Committee (and its delegates) shall have complete discretionary authority to determine eligibility for participation and benefits under the Plan, to construe and interpret all provisions of the Plan and all documents relating thereto, to resolve questions and disputes, and to assure a reasonable and consistent application of the Plan to all Participants and Beneficiaries.   All deference permitted by law shall be given to such constructions, interpretations and determinations.

11.5   Indemnification

Unless the Board of Directors of the Company shall determine otherwise, the Company shall indemnify, to the full extent permitted by law, any member of the Benefits and Investment Committee or any Employee acting in good faith in carrying out the administration of the Plan.

11.6   Expenses of the Plan

All usual and reasonable expenses of maintaining, operating and administering the Plan and the Trust, including the expenses of the Benefits and Investment Committee and the Trustee (and their agents), shall be paid from the Trust (whether directly or by reimbursement to the Company or the Employer), except to the extent the Company or the Employer elect to pay such expenses.

11.7   Allocation of Plan Expenses

(a)   The Benefits and Investment Committee may specify rules for charging expenses to the Plan.   A fee for the maintenance of Participant Accounts may be charged, to be assessed as a charge on the Account of each Participant or on the Accounts of designated subgroups of Participants, and calculated on a per capita or percentage basis, as determined by the Benefits and Investment Committee.

(b)   The Benefits and Investment Committee may specify rules for charging expenses to each Investment Fund, which may be calculated and apportioned to Participants on a per capita or percentage basis, as determined by the Benefits and Investment Committee.

US2008 5342155

11.8 <u>Service in More Than One Capacity</u>

Any person or group of persons may serve the Plan in more than one fiduciary capacity under the Plan, or may serve the Plan in a fiduciary capacity and in a non-fiduciary capacity. A person or group of persons who serves in both a fiduciary capacity and a non-fiduciary capacity shall only have a fiduciary duty to the Plan to the extent that actions are taken in a fiduciary capacity.

11.9 <u>Claims Procedure</u>

(a) <u>General</u>: The Benefits and Investment Committee, or a party designated by the Benefits and Investment Committee, shall have the exclusive discretionary authority to construe and to interpret the Plan, to decide all questions of eligibility for benefits and to determine the amount of such benefits. As a result, benefits under this Plan will be paid only if the Benefits and Investment Committee decides in its discretion that the Participant (or other applicant) is entitled to them. All decisions made by the Benefits and Investment Committee shall be final, binding and conclusive. This discretionary authority is intended to be absolute, and in any case where the extent of this discretion is in question, the Benefits and Investment Committee is to be accorded the maximum discretion possible. Any exercise of this discretionary authority shall be reviewed by a court under the arbitrary and capricious standard (i.e., the abuse of discretion standard).

(b) <u>Initial Determination</u>: If, pursuant to the discretionary authority provided for in subsection (a) above, an assertion of any right to a benefit by or on behalf of a Participant or Beneficiary is wholly or partially denied, the Benefits and Investment Committee, or a party designated by the Benefits and Investment Committee, will provide such claimant the claims review process described in this Section. Within a 90-day response period following the receipt of the claim by the Benefits and Investment Committee, the Benefits and Investment Committee will provide a comprehensible notice setting forth:

(1) The specific reason or reasons for the denial;

(2) Specific reference to pertinent Plan provisions on which the denial is based;

56

(3)    A description of any additional material or information necessary for the claimant to submit to perfect the claim and an explanation of why such material or information is necessary; and

(4)    A description of the claims review process (including the time limits applicable to such process and a statement of the claimant's right to bring a civil action under ERISA following a further denial on review).

If the Benefits and Investment Committee determines that special circumstances require an extension of time for processing the claim, it may extend the response period from 90 to 180 days.  If this occurs, notice of the extension will be furnished to the claimant before the end of the initial 90-day period, indicating the special circumstances requiring the extension and the date by which the Administrator expects to make the final decision.

(c)    Appeal of Claim:  Further review of a claim is available upon written request by the claimant to the Benefits and Investment Committee within 60 days after receipt by the claimant of notice of the denial of the claim.  Upon review, the Benefits and Investment Committee shall provide the claimant a full and fair review of the claim, including the opportunity to submit to the Benefits and Investment Committee written comments, documents, records and other information relevant to the claim and the Benefits and Investment Committee's review shall take into account such comments, documents, records and information regardless of whether it was submitted or considered at the initial determination.  The decision on review shall be made within 60 days after receipt of the request for review, unless circumstances warrant an extension of time not to exceed an additional 60 days.  If this occurs, notice of the extension will be furnished to the claimant before the end of the initial 60-day period, indicating the special circumstances requiring the extension and the date by which the Benefits and Investment Committee expects to make the final decision.  The final decision shall be drafted in a manner calculated to be understood by the claimant, and shall include the specific reasons for the decision with references to the specific Plan provisions on which the decision is based.

(d)    Form of Notice:  Any notice required to be sent to a claimant under this Section shall be sent in writing or through electronic media as provided by Department of Labor Regulation section 2520.104b-1(c).

57

US2008.5357129.7

(e)     Court Review of Claims:  Any claim referenced in this Section that is reviewed by a court, arbitrator, or any other tribunal shall be reviewed solely on the basis of the record before the Benefits and Investment Committee.

(f)     Supplements to Procedures:  The Benefits and Investment Committee is authorized to establish any specific and/or additional claims procedures that apply to the submission and consideration of any issue or matter that is not directly related to a claim for benefits or may apply by analogy the claims procedures listed in this Section to the submission and consideration of such issue or matter.  Such claims procedures may be established at any time, including after the issue or matter is first submitted to the Benefits and Investment Committee.  All such claims procedures shall comply with Department of Labor Regulation section 2560.503-1.

11.10  Exhaustion of Claims Procedures

(a)     Before filing any claim, suit or action in court or in another tribunal, any Employee, former Employee, Participant, former Participant, beneficiary (or the Spouse, former Spouse, estate, heir or representative of any of the foregoing individuals), or any other individual, person, entity with a relationship to any of the foregoing individuals or the Plan, as well as any group of one or more of the foregoing (each and collectively, a "Claimant") must first fully exhaust all of the Claimant's actual or potential rights under the claims procedures of Section 11.9, including such rights as the Benefits and Investment Committee may choose to provide in connection with novel claims, disputes or issues or in particular situations.  For purposes of the prior sentence, any Claimant that has any claim, dispute, issue or matter that implicates in whole or in part –

(1)     The interpretation of the Plan;

(2)     The interpretation of any term or condition of the Plan;

(3)     The interpretation of the Plan (or any of its terms or conditions) in light of applicable law;

(4)     Whether the Plan or any term or condition under the Plan has been validly adopted or put into effect;

(5)     The administration of the Plan,

58

(6)     Whether the Plan, in whole or in part, has violated any terms, conditions or requirements of ERISA or other applicable law, regardless of whether such terms, conditions or requirements are, in whole or in part, incorporated into the terms, conditions or requirements of the Plan, or

(b)     Any claim, dispute, issue or matter that -- (i) is deemed similar to any of the foregoing by the Benefits and Investment Committee, or (ii) relates to the Plan in any way, including claims for benefits under the Plan, claims for appropriate equitable relief or claims for recovery of losses to the Plan for a breach of fiduciary duty (or two or more of these) (each and collectively, a "Claim") shall not be considered to have satisfied the exhaustion requirement of this Section unless the Claimant first submits the Claim to the Benefits and Investment Committee to be processed pursuant to the claims procedures contemplated by Section 11.9 (or to be otherwise considered by the Benefits and Investment Committee) and fully exhausts such claims procedures, and regardless of whether other claims, disputes, issues or matters that are not Claims (including those that a court might consider at the same time) are of greater significance or relevance.  The exhaustion requirement of this Section shall apply even if the Benefits and Investment Committee has not previously defined or established specific claims procedures that directly apply to the submission and consideration of such Claim, and in which case the Benefits and Investment Committee (upon notice of the Claim) shall either promptly establish such claims procedures or shall apply (or act by analogy to) the claims procedures of Section 11.9 that apply to claims for benefits.  Upon review by any court or other tribunal, this exhaustion requirement is intended to be interpreted to require exhaustion in as many circumstances as possible (and any steps necessary to clarify or effect this intent may be taken).  The Benefits and Investment Committee may make special arrangements to consider a Claim on a class basis or to address unusual conflicts concerns, and such minimum arrangements in these respects shall be made as are necessary to maximize the extent to which exhaustion is required.  In any subsequent action or consideration of a Claim, in court or another tribunal, the subsequent action or consideration shall be limited, to the maximum extent permissible, to the record that was before the Benefits and Investment Committee in the claims procedure.

11.11  Limitations on Actions

US2008 5537 1

Effective from and after January 1, 2015, any claim, action or suit filed or brought in state or Federal court (or any other tribunal) by or on behalf of a Claimant (as defined in Section 11.10) with respect to this Plan must be brought within the applicable timeframe that relates to the claim, action or suit, listed as follows:

(a)     Any claim, action or suit relating to the alleged wrongful denial of Plan benefits must be brought and filed within two (2) years of the earlier of (i) the date that the Claimant has received the Account statement of his Account benefits that are the subject of the claim, action or suit, or (ii) the date that he received payment of the Plan benefits in question; and

(b)     Any other claim, action or suit not covered by subsection (a) above (including a claim, action or suit relating to an alleged interference or violation of ERISA-protected rights), must be brought and filed within two (2) years of the date when the Claimant has actual or constructive knowledge of the acts that are alleged to give rise to the claim, action or suit.

(c)     Failure to bring any such claim, action or suit within the aforementioned timeframes shall mean that such claim, action or suit is null and void and of no effect. Correspondence or other communications (including the mandatory claim procedures in Section 11.9) by the Company, an Employer, the Benefits and Investment Committee or any other person or entity related or affiliated with the Company shall have no effect on the above timeframes.

11.12  Restrictions on Venue

Effective from and after January 1, 2015, any claim, action or suit brought or filed in court or any other tribunal in connection with the Plan by or on behalf of a Claimant (as defined in Section 11.10) shall only be brought and filed in the United States District Court for the District of Delaware.

11.13  Records and Reports

The Benefits and Investment Committee shall exercise such authority and responsibility as it deems appropriate in order to comply with ERISA and government regulations issued thereunder relating to records of Participants' service and benefits; notifications to Participants;

US2008 5537173

reports to, or registration with, the Internal Revenue Service; reports to the Department of Labor; and such other documents and reports as may be required by ERISA.

11.14  Administrative Powers and Duties

The Benefits and Investment Committee shall have such powers and duties as may be necessary or desirable to discharge its functions hereunder, including:

(a)     To exercise its discretionary authority to construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner and time of payment of any benefits hereunder;

(b)     To prescribe procedures to be followed by Participants or Beneficiaries filing applications for benefits;

(c)     To make all decisions and to send all notices of denied benefit claims under the provisions of Section 11.9;

(d)     To prepare and distribute, in such manner as the Benefits and Investment Committee determines to be appropriate, information explaining the Plan;

(e)     To receive from Employees and agents and from Participants such information as shall be necessary for the proper administration of the Plan;

(f)     To receive, review and keep on file (as it deems convenient or proper) reports of the financial condition, and of the receipts and disbursements, of the Trust from the Trustee;

(g)     To appoint or employ individuals or other parties to assist in the administration of the Plan and any other agents it deems advisable, including accountants, actuaries and legal counsel;

(h)     To recover excess payments, including as permitted by Section 16.7;

(i)     To compromise claims or rights, as determined to be appropriate by the Benefits and Investment Committee in the exercise of its sole discretion; and

(j)     To delegate to other persons or entities, or to designate or employ persons to carry out any of the Benefits and Investment Committee's fiduciary duties or responsibilities or other functions under the Plan.

61

US2008 5537173

### 11.15  Rules and Decisions

The Benefits and Investment Committee may adopt such rules and procedures as it deems necessary, desirable, or appropriate.  To the extent practicable, all rules and decisions of the Benefits and Investment Committee shall be uniformly and consistently applied to all Participants in similar circumstances.  When making a determination or calculation, the Benefits and Investment Committee shall be entitled to rely upon information furnished by a Participant or beneficiary, the legal counsel of the Benefits and Investment Committee, or the Trustee.

### 11.16  Procedures

The Benefits and Investment Committee shall keep all necessary records and forward all necessary communications to the Trustee.  The Benefits and Investment Committee may adopt such regulations as it deems desirable for the administration of the Plan.

### 11.17  Authorization of Benefit Distributions

The Benefits and Investment Committee shall issue directions to the Trustee concerning all benefits which are to be paid from the Trust pursuant to the provisions of the Plan, and shall warrant that all such directions are in accordance with this Plan.

### 11.18  Application and Forms of Distributions

The Benefits and Investment Committee may require a Participant to complete and file with the Benefits and Investment Committee an application for a distribution and all other forms approved by the Benefits and Investment Committee, and to furnish all pertinent information requested by the Benefits and Investment Committee.  The Benefits and Investment Committee may rely upon all such information so furnished it, including the Participant's current mailing address, age and marital status.

## ARTICLE XII
## TRUST FUND

### 12.1  Trust Fund

The Trust Fund shall be held in trust by the Trustee appointed from time to time (before or after termination of this Plan) by the Benefits and Investment Committee pursuant to the underlying Trust Agreement.  The Trustee shall invest the Trust Fund in the Investment Funds

62

LN2008 553 '1 '5

designated by the Benefits and Investment Committee according to the investment elections of Participants and Beneficiaries as provided by Article V. The Trustee shall have the powers specified in the Trust Agreement.

### 12.2 Exclusive Benefit

The Trust Fund shall be used in accordance with the provisions of this Plan and for the exclusive purpose of providing benefits for Participants and their Beneficiaries and for defraying reasonable expenses of the Plan and of the Trust. The Trustee shall cause the Trust Fund to consist of the Investment Funds specified in Section 5.1.

### 12.3 Employer Contributions Irrevocable

Subject to Section 12.4, any contribution made by an Employer shall be irrevocable and shall be held and disposed of by the Trustee solely in accordance with the provisions of this Plan and the Trust.

### 12.4 Exceptions to Irrevocability

Each contribution made by an Employer or an Eligible Employee shall be deemed to be conditioned upon the deductibility of the contribution under Code Section 404. If the deduction of all or part of any contribution is disallowed, it shall, to the extent disallowed, be repaid to the Employer within one year after the date of disallowance. A contribution also will be repaid to an Employer, within one year after the date made, to the extent it was made in error because of a mistake of fact.

## ARTICLE XIII
## DESIGNATION OF BENEFICIARY

### 13.1 Designation of Beneficiary

Subject to Section 13.2, Participants may designate a Beneficiary in the form and manner prescribed by the Benefits and Investment Committee. The Benefits and Investment Committee, in its discretion, may specify conditions or other provisions with respect to the designation of a Beneficiary. A designation of a Beneficiary may be revoked by filing a later designation or revocation. In the absence of an effective designation of a Beneficiary by a Participant or upon the death of all Beneficiaries prior to the Participant's death, a Participant's vested Account

63

Balance shall be paid to the Participant's surviving Spouse, or if the Participant does not have a surviving Spouse, then such amounts shall be paid to his or her estate or legal representative.

### 13.2   Beneficiary of a Married Participant

A married Participant's sole Beneficiary shall be his or her Spouse unless his or her Spouse executes a written consent to the designation of another Beneficiary and acknowledges the effect of the designation. The Spouse's consent must be witnessed by a notary public or a Plan official. A married Participant's designation of a Beneficiary other than his or her Spouse under this Section 13.2 may not be changed without the subsequent consent of his or her Spouse, unless the Spouse's consent permits the Participant to designate any other Beneficiary and acknowledges that the Spouse has voluntarily relinquished rights to limit consent to a specific Beneficiary. A married Participant's Spouse's consent to a Beneficiary other than his or her Spouse is not required if (a) his or her Spouse cannot be located, (b) the Participant is legally separated from his or her Spouse or (c) the Participant has been abandoned by his or her Spouse (within the meaning of local law) and the Participant has a court order to that effect. A Participant's designation of a Beneficiary other than his or her Spouse shall be effective only with respect to the Spouse who consents to it as provided in this Section 13.2.

### 13.3   Effective Date of Designation

Any designation or revocation of a designation of a Beneficiary shall become effective when actually received by the Benefits and Investment Committee but shall not affect any distribution previously made pursuant to a prior designation.

## ARTICLE XIV
## AMENDMENT OR TERMINATION

### 14.1   Amendment

The Board of Directors of the Company may amend this Plan and/or the Trust Agreement at any time but no amendment may (a) entitle an Employer to receive any part of the Trust Fund, (b) substantially increase the duties or liabilities of the Trustee without its prior written consent, or (c) have the effect of reducing the accrued benefit (within the meaning of Code Section 411(d)(6)) of anyone who is a Participant on the date the amendment is adopted or becomes effective, whichever is later. In addition, the Benefits and Investment Committee is authorized

64

to amend the Plan which authority shall be exercised in a manner the Benefits and Investment Committee deems necessary or desirable; provided, however, that the Benefits and Investment Committee shall not be authorized to (i) amend any provision to increase or decrease the Employer contributions required under the Plan, or (ii) terminate the Plan. Notwithstanding any other provision of the Plan, it is expressly permissible for the Board of Directors of the Company or the Benefits and Investment Committee to clarify the terms of this document, even retroactively, by an amendment accomplishing a good faith correction of any typographical error or inadvertent scrivener's error.

14.2  Amendment to Vesting Provisions

If the vesting provisions set forth in Article VI, including without limitation Section 6.3, are amended, any Participant who as of the effective date of the amendment has been credited with three or more Years of Vesting Service in the aggregate, may irrevocably elect to have his or her nonforfeitable interest computed without regard to the amendment.   Notice of the amendment and the availability of the election shall be given to each such Participant, and the election may be exercised by the Participant by notice to the Benefits and Investment Committee within 60 days after the later of (a) his or her receipt of the notice, (b) the day the amendment is adopted or (c) the effective date of the amendment.

14.3  Amendment to Maintain Qualified Status

Notwithstanding anything to the contrary in Section 14.1, the Board of Directors of the Company, in its discretion, may make any modifications or amendments to the Plan, retroactively or prospectively, which it deems appropriate to establish or maintain the Plan and the Trust as a qualified employee plan and trust under Code Sections 401 and 501.

14.4  Termination of the Plan.

The Plan herein provided for has been established by the Company with the bona fide intention that it shall be continued in operation indefinitely.  However, the Company reserves the right at any time to terminate or to partially terminate the Plan and the Trust Agreement.  The Company's rights under this Section 14.4 shall be no less than its rights under Section 14.1.

US2005 5337175

### 14.5  Full Vesting upon Plan Termination

Upon the termination or partial termination (as that term is defined for purposes of Code Section 411(d)(3)) of this Plan or upon the complete discontinuation of contributions by an Employer, the Account Balances as of the date of termination in the Profit Sharing Contribution Account and Matching Contribution Account of the affected Participants shall be nonforfeitable.

### 14.6  The Committee and Trustee

If the entire Plan is terminated, the Benefits and Investment Committee shall continue to function and may fill any vacancies which may occur in its own membership (if the Board of Directors of the Company fails to do so) until the Trustee has rendered its final account and that account has been approved (in the manner provided in the Trust).

### 14.7  Merger, Consolidation or Transfer of Assets

Neither this Plan nor the Trust may be merged or consolidated with, nor may its assets or liabilities be transferred to any other plan or trust unless each Participant would receive a benefit immediately after the merger, consolidation or transfer, if the Plan then terminated, which is equal to or greater than the benefit he or she would have been entitled to receive immediately before the merger, consolidation, or transfer if this Plan had then been terminated.

### 14.8  Restrictions on Distribution upon Plan Termination

Upon the termination of this Plan with respect to an Employer, (a) in no event shall a Participant receive a distribution of the portion of his or her vested Account Balance attributable to Elective Deferrals unless there is no successor plan established or maintained (as defined for purposes of Code Section 401(k)(10)(A) and related regulations) and (b) in no event shall a Participant receive a distribution of his or her vested Account Balance without his or her consent before his or her attainment of age 65 (or, if earlier, death) unless there is no other Defined Contribution Plan maintained by the Employer or the value of that vested Account Balance does not exceed $5,000.

US2008 5337 1 2

## ARTICLE XV
## ADOPTION AND WITHDRAWAL

### 15.1 Adoption by Affiliated Company

Any Affiliated Company, whether or not presently existing, may, with the approval of the Board of Directors of the Company, adopt this Plan by proper corporate actions.

### 15.2 Withdrawal by Employer

Any Employer may at any time withdraw from the Plan upon giving the Board of Directors of the Company, the Benefits and Investment Committee and the Trustee at least 30 days' notice of its intention to withdraw.  The Board of Directors of the Company in its discretion may direct that any Employer withdraw from the Plan.

### 15.3 Segregation of Assets upon Withdrawal

Upon the withdrawal of an Employer under Section 15.2, the Trustee shall in accordance with the directions of the Benefits and Investment Committee segregate a share of the assets in the Trust Fund equal in value to the total Account Balances of Participants who are Employees of that Employer.

### 15.4 Applicability

The withdrawal provisions of this Article XV shall be applicable only if the withdrawing Employer continues to cover its Participants and Eligible Employees in a comparable plan and trust qualified under Code Sections 401 and 501.  Otherwise, the termination provisions of this Plan shall apply with respect to the withdrawing Employer.

## ARTICLE XVI
## MISCELLANEOUS

### 16.1 No Employment Rights

Nothing in this Plan shall be construed as a contract of employment between an Affiliated Company and any Employee, nor as a guarantee of any Employee to be continued in the employment of an Affiliated Company, nor as a limitation on the right of an Affiliated Company to discharge any of its Employees with or without cause or with or without notice at the option of the Affiliated Company.

US2008 5537 5 1

16.2  Non-Alienation

Subject to Section 16.3, Account Balances under or interests in this Plan shall not be assignable or subject to alienation, hypothecation, garnishment, attachment, execution or levy of any kind.  Any action in violation of this provision shall be void.

16.3  Qualified Domestic Relations Orders

Section 16.2 shall not apply to the creation, assignment or recognition of a right to the Account Balances of a Participant pursuant to a qualified domestic relations order (as defined in Code Section 414(p)).  The Benefits and Investment Committee shall establish reasonable procedures for determining whether a domestic relations order is a qualified domestic relations order and for administering distributions under a qualified domestic relations order.

16.4  Merged Plan

The Company may for purposes of this Plan (a) designate any employee pension benefit plan (as defined in Section 3(2) of ERISA) as a Merged Plan and (b) give credit for participation in a Merged Plan to the extent the Board determines desirable.  The Board of Directors of the Company shall notify the Benefits and Investment Committee of the designation of any Merged Plan, and of credit to be given for participation in the Merged Plan.

16.5  Veterans' Reemployment Rights and Military Service.

(a)     General.  Notwithstanding any provision of this Plan to the contrary, effective as of December 12, 1994, contributions, benefits and service credit with respect to qualified military service as defined under Code Section 414(u) ("Military Service") will be provided in accordance with Code Section 414(u).

(b)     Differential Pay.  Notwithstanding any provision of this Plan to the contrary, any Participant who receives differential wage payments (as defined in Code Section 3401(h)(2)) from the Employer on or after January 1, 2009 and during a period of Military Service ("Differential Pay") shall, for purposes of this Plan, be considered an Employee of the Employer.  Differential Pay shall be treated as Compensation (provided the applicable requirements of Code Section 414(u) for the inclusion of such Compensation are satisfied), including 415 Compensation.

(c)     Death Benefits.  Notwithstanding anything in the Plan to the contrary, in the case of a Participant who dies on or after January 1, 2007, while performing Military Service and

68

therefore would have been entitled to reemployment rights pursuant to the Uniformed Services Employment and Reemployment Rights Act ("USERRA") on the date of death, his Spouse (or other Beneficiary) is entitled to any additional death benefits (other than contributions to the Participant's Account Balance which are attributable to the Participant's period of Military Service) that would have been provided under the Plan if the Participant had resumed employment with the Employer and then terminates service on account of death. For purposes of this death benefit the deceased Participant's period of Military Service shall be included in his Years of Vesting Service.

### 16.6  No Interest in Trust Fund

Irrespective of the amount of a Participant's Account Balance, neither the Participant nor his or her Beneficiary or any other person shall have any interest or right to any of the assets of the Trust Fund except as and to the extent expressly provided in this Plan.

### 16.7  Recovery of Excess Payments

(a)    Wholly for the avoidance of doubt, it is noted that this Plan contemplates and provides that payments to, for or in connection with a Participant that are made (as of a point in time and to any person or entity) may not exceed the exact amount of payments that are due as of such time and to such person, as provided by the terms of the Plan that specify the amounts that are payable, the time as of which they are payable, and the person to whom they are payable. Accordingly, any such excess payment or any other overpayment, premature payment or misdirected payment (one or more of which are hereafter referred to as an "Excess Payment") may not be retained by the party receiving it, but must be restored promptly to the Plan with appropriate interest. In addition, it is hereby clarified that, in exchange for Participant or Beneficiary status hereunder (or for having any other direct or indirect right or claim of right from the Plan, or solely as a result of having received an Excess Payment), any party receiving an Excess Payment grants to the Plan the following nonexclusive rights --

(b)    A constructive trust and first priority equitable lien on any payment that is received directly or indirectly from the Plan and that is, in whole or part, an Excess Payment (such trust and lien shall be equal to the amount of the Excess Payment increased by appropriate interest) or upon the proceeds or substitutes for such payment, and any transfer shall be subject to such constructive trust and equitable lien (including a transfer to a person, trust fund or entity).

69

(c)     The right to offset (as necessary to recover the Excess Payment with appropriate interest) other payments that are properly payable by the Plan to the recipient of the Excess Payment; however, reliance on this right is in the discretion of the Benefits and Investment Committee, and the existence of an opportunity to apply it shall not diminish the Plan's rights under subsection (a) above.

(d)     The right to bring any equitable or legal action or proceeding with respect to the enforcement of any rights in this Section 16.7 in any court of competent jurisdiction as the Plan may elect, and following receipt of an Excess Payment the Participant hereby submits to each such jurisdiction, waiving any and all rights that may correspond to such party's present or future residence.

(e)     Any party receiving an Excess Payment shall promptly take all actions requested by the Benefits and Investment Committee (or Committee Delegate) that are in furtherance of the Plan's recovery of the Excess Payment with appropriate interest. In all cases, this Section 16.7 shall maximize the rights of the Plan to recover improper payments and shall not restrict the rights of the Plan in any way, including with respect to any improper payment that is not addressed above. In addition, equitable or legal principles that might impair the Plan's right of recovery of an Excess Payment with appropriate interest shall not apply (including the common fund doctrine and any requirement that funds not be commingled or dissipated in order to be recovered). For purposes of this Section and the recovery of Excess Payments, "appropriate interest" shall mean a rate of interest (and a period for compounding) that is determined by the Benefits and Investment Committee, in its sole discretion, to be – (i) reasonable at the time, and (ii) sufficient to avoid enrichment of the recipient at the expense of the Plan.

16.8 Governing Law

The provisions of this Plan shall be governed by and construed and administered in accordance with ERISA, the Internal Revenue Code, and, where not inconsistent, the laws of the State of Delaware in which the Company is incorporated.

US2008 553 173

16.9  Participant Information

Each Participant shall notify the Benefits and Investment Committee of (a) his or her mailing address and each change of mailing address, (b) the Participant's, the Participant's Beneficiary's and, if applicable, the Participant's Spouse's date of birth, and (c) his or her marital status and any change of his or her marital status and (d) any other information required by the Benefits and Investment Committee.  The information provided by the Participant under this Section 16.9 shall be binding upon the Participant and the Participant's Beneficiary for all purposes of the Plan.

16.10  Severability

If any provision of this Plan is held illegal or invalid for any reason, the other provisions of this Plan shall not be affected.

16.11  Notices

Any notice, request, election, designation, revocation or other communication under this Plan shall be in writing and shall be considered given when delivered personally or mailed by registered mail, return receipt requested, except that any communication furnished to all Participants shall be considered given when delivered personally or mailed by first class mail.

16.12  Headings

The headings in this Plan are for convenience of reference and shall not be given substantive effect.

Dated: 10/6/14

NESTLE WATERS NORTH AMERICA HOLDINGS INC.

By: _____

Michael T. Swinton
Executive Vice President, Human Resources

## SCHEDULE A

## BACKGROUND OF PLAN

**ARROWHEAD WATER CORP.** has previously adopted THE ARROWHEAD WATER CORP. Individually Vested Employees Savings Trust, effective July 27, 1987. THE ARROWHEAD WATER CORP. Individually Vested Employee Savings Trust contained a qualified cash or deferred arrangement within the meaning of Internal Revenue Code Section 401(k).

The Perrier Group Of America, Inc. Profit Sharing Plan and Trust and the Arrowhead Water Corp. Individually Vested Employee Savings Trust merged, effective January 1, 1989. THE PERRIER GROUP OF AMERICA, INC. extended the qualified cash or deferred arrangement previously available to employees of ARROWHEAD WATER CORP. to all non-collectively bargained Participants under the merged plans, effective January 1, 1989.

THE PERRIER GROUP OF AMERICA, INC. Profit Sharing Plan and Trust was renamed THE PERRIER GROUP OF AMERICA, INC. PROFIT SHARING AND 401(k) PLAN AND TRUST, and was amended and restated in its entirety, effective January 1, 1989, except as otherwise noted in the Plan document. The Perrier Group of America, Inc. Profit Sharing and 401(k) Plan and Trust was amended and restated effective as of January 1, 1995 through January 1, 2002 except as otherwise provided in the Plan document or in Schedule B. THE PERRIER GROUP OF AMERICA, INC. PROFIT SHARING AND 401(k) PLAN AND TRUST was subsequently renamed THE NESTLÉ WATERS NORTH AMERICA PROFIT SHARING AND 401(k) PLAN AND TRUST. Effective as of January 1, 1999 the San Pellegrino USA, Inc. 401(k) Plan was merged into this Plan.

Effective as of January 1, 2002 (or as soon as administratively practicable thereafter) the portion of the Black Mountain Spring Water 401(k) Savings Plan applicable to salaried employees and the Modesto Bottled Water Inc. Profit Sharing and 401(k) Plan were merged into this Plan. Effective as of April 1, 2002, those participants in the Black Mountain Spring Water 401(k) Savings Plan who were covered by a collective bargaining agreement became participants in this Plan and the Black Mountain Spring Water 401(k) Savings Plan was merged into the Plan

72

effective as of June 1, 2002.  Effective as of April 1, 2002, special provisions of the Plan applicable to those individuals who are Black Mountain Livermore Union Employees (as defined in Schedule D of this Plan) are specified in Schedule D of the Plan and except as specifically provided are effective through December 31, 2003.

Effective as of January 1, 2002, the Plan was amended to reflect certain provisions of the Economic Growth and Tax Relief Reconciliation Act of 2001 ("EGTRRA") and such amendments are intended as good faith compliance with EGTRRA and shall be construed in accordance with the provisions of EGTRRA and guidance issued thereunder.  Effective as of May 1, 2003, the Nestlé Waters (Sparkling Spring) Profit Sharing and 401(k) Plan ("Sparkling Spring Plan") was merged into the Plan.  The benefits and contributions under this Plan for the period beginning on May 1, 2003 and ending on May 9, 2003 provided to a Participant who was a participant in the Sparkling Spring Plan on April 30, 2003, shall be determined under the applicable provisions of the Sparkling Spring Plan in effect on April 30, 2003.

Effective as of January 1, 2008, the Plan was amended to reflect the provisions of the Pension Protection Act of 2006.  Effective as of April 1, 2012, the Tradewinds Beverage Company 401(k) Profit Sharing Plan was merged into this Plan.  Effective as of June 1, 2012, the Sweet Leaf Tea Company 401(k) Plan was merged into this Plan.

## SCHEDULE B

## EFFECTIVE DATES

The provisions of this amended and restated Plan are effective as of January 1, 2014 except as otherwise provided in the Plan or below:

(a)      The following provision is amended effective as of January 1, 2007:

Section 16.5(c) – a participant who dies after January 1, 2007 and while performing qualified military severance shall be treated as an Employee (other than for purposes making contributions).

(b)      The following provisions are amended effective as of January 1, 2009:

(1)      Section 7.1 - ability to elect distributions before Normal Retirement Date.

(2)      Section 7.5 – ability to suspend 2009 required minimum distribution.

(3)      Section 16.5(b) – Differential Pay is treated as 415 Compensation and Compensation and a Participant is treated as an Eligible Employee while receiving Differential Pay.

(c)      The following provision is amended effective for loans made on or after March 2, 2009:

Section 8.1 (limit of loans to amount of Elective Deferrals and imposition of a 60-day waiting period on loans that are not Primary Residence Loans)

(d)      The following provision is amended effective for hardship withdrawals that are made on or after March 13, 2009:

Section 7.6(c) (Automatic resumption of Elective Deferrals at pre-suspension percentage).

(e)      The following provision is amended effective for distributions on or after May 26, 2009:

Section 7.10 (ability for nonspousal beneficiary to elect direct rollover).

(f)      The following provision is amended effective October 15, 2009:

Section 7.1 (timing of distribution).

74

US.2005.5537175.

(g)    The following provision is amended effective January 1, 2010:

Section 7.6(b)(6) (addition of designated Plan beneficiary).

(h)    The following provision is amended effective December 1, 2010:

Section 3.9(c) (rollovers accepted from Affiliated Companies' qualified plans).

(i)    The following provisions are amended effective December 14, 2011:

(1)    Section 4.3(b) (Profit Sharing Contribution allocations for transfers to Affiliated Company).

(2)    Sections 7.1, 7.2, 7.4 and 7.8 (Participants entitled to receive distributions as installments or withdrawals).

(3)    Section 8.1 (loan repayment options for non-active participants, including employees of Affiliated Companies).

75

LS2008.553.175

## SCHEDULE C

## ADDITIONAL EMPLOYER CONTRIBUTIONS

In addition to the Employer Contributions set forth in Article IV, as well as any Employer Contributions designated in a Schedule to the Plan, the Employer shall make the following additional Employer Contributions to the Plan for the periods designated as follows:

I.     Prior Union 812 Participants

The Employer will contribute annual periodic payments into the Account Balances of the Non-Highly Compensated Employees (as defined under Code Section 414(q) listed below, which in total will equal the lump sum value of the pension benefit which would have been payable from the Union Local 812 Retirement Fund at age 60 with 10 years of service based on the 1983 GAM table and 7% interest, as set forth in the amounts set forth in the Lump Sum Amount column in the table below.  The amount of each the total payment set forth in the table below will be spread over the number of years remaining to complete 10 Years of Service and also must comply with the Code and regulations, and are further subject to the Employee being an active Participant of this Plan on each periodic payment date.

| Names | Effective Date | Lump Sum Amount |
|---|---|---|
| Malcom Allen | January 5, 1994 | $31,044.02 |
| George DelMonte | January 5, 1994 | 10,283.26 |
| Al Sciancalepore | January 5, 1994 | 35,779.87 |
| Rob Young | January 5, 1994 | 15,508.84 |
| Richard Hansen | September 1, 1994 | 8,970.55 |
| David Kennedy | September 1, 1994 | 7,310.74 |
| Patrick Prather | September 1, 1994 | 1,241.76 |
| Raymond Betto | October 1, 1994 | 15,508.84 |
| Paul Howard | October 1, 1994 | 14,480.24 |
| Kenneth Rotunno | October 1, 1994 | 8,378.90 |

US2008 553 173

An Employee who was a participant in a collectively bargained plan while an Employee of the Employer will become a participant in this Plan as of the first day he or she satisfies Section 3.1 and his or her Years of Eligibility Service and Vesting Service shall include his or her service while a collectively bargained employee.

II.    Former Teamster Participant

Beginning with the 1998 Plan Year, the Employer shall contribute annual periodic payments into the Account Balances of Former Teamster Participants who as of June 30, 1998 had either (1) attained age 61 or (2) been credited with at least five years of vesting service. The total potential annual payments for each Participant shall equal the lump sum value of the pension benefit which would have been payable from the Teamster Pension Plan of Philadelphia and Vicinity on June 30, 1998. Set forth below is the amount of the annual periodic payment to be made into the Account Balances of the Employees listed below and the number of years for which the payment shall be made for each Employee.  The amount of each payment must comply with the Code and regulations, and annual payments are subject to the Employee being an active Participant of the Plan on each periodic payment date.

| Name | Present Value of Total Union Benefit as of 7/1/98 | Number of Years for which Annual Contribution Will be made | Amount of Annual Contribution |
|---|---|---|---|
| Christian, Mike | $  4,698.79 | 3 | $  1,566.26 |
| Conrad, Denis | 8,309.37 | 2 | 4,154.69 |
| Delvecchio, Charles | 26,309.37 | 5 | 5,261.87 |
| Garvin, Gary | 6,734.81 | 5 | 1,346.96 |
| Kavetski, Bob | 6,627.48 | 5 | 1,325.50 |

77

| | | | |
|---|---|---|---|
| McDermott, Vince | 31,963.59 | 1 | 31,963.59 |
| McGowen, Frank | 9,024.62 | 2 | 4,512.31 |
| McNish, Fran | 5,200.75 | 4 | 1,300.19 |
| Nardone, Tony | 22,985.58 | 7 | 3,283.65 |
| Page, Charles | 6,807.76 | 5 | 1,361.55 |
| Trainer, Mike | 4,069.87 | 4 | 1,017.47 |
| Traini Phil | 10,620.85 | 1 | 10,620.85 |

III.     Prior NWS 401(k) Plan Participants

The Employer shall make a contribution to the Plan as of June 5, 2000, for a Cameron Springs Employee who was a participant in the NWS 401(k) Plan, but who did not have a vesting period of service of at least five years under the NWS 401(k) Plan as of June 5, 2000. The Participants entitled to the contribution described in the prior sentence and the amount of these contributions are as follows:

| Name | Amount of Contribution |
|---|---|
| Mark Gill | $2,450.52 |
| Jeff Hofmeister | $2,458.64 |
| Frank Hall | $2,376.14 |

IV.     Certain Non-Highly Compensated Employees

For the 2011 Plan Year, the Employer shall make an additional Employer Contribution to the Plan on behalf of certain Non-Highly Compensated Employees for the 2011 Plan Year as set forth below, which shall be adjusted for earnings from the date that other Profit Sharing Contributions for the 2011 Plan Year were contributed to the Plan:

| Name | Amount of Contribution |
|---|---|
| Thomas Mcclanahan | $272.26 |
| Robert Hoaglan | $2,481.60 |
| Linda Jamroz | $3,027.19 |

V.     Special Rules

US2008 533 175 2

In the case of a Former Teamster Participant who is an Eligible Employee in the employ of the Employer or on a Leave of Absence on December 31, 1998, he will be entitled to share in the allocation of the Profit Sharing Contribution for 1998 based on Compensation earned on or after July 1, 1998, regardless of whether he completed 1,000 Hours of Service in 1998.  In the case of a Participant who was a participant in the Nestle Waters (Sparkling Spring) Profit Sharing and 401(k) Plan (the "Plan") and who during 2002 ceased to be a member of a union as a result of the union's decertification at the Sparkling Spring location (as evidenced by an N.L.R.B. notification) ("Sparkling Spring Former Union Employee") or was a salaried employee and became a participant on August 1, 2002, he shall be entitled to a profit sharing contribution for 2002 under Section 4.3 based on his Compensation (as determined under Section 1.12, but without regard to the requirement that the compensation be earned while a Participant) received during the period beginning on May 15, 2002 and ending on December 31, 2002.  In the case of a Participant who previously participated in the Nestle Waters (Sparkling Spring) Profit Sharing and 401(k) Plan, he shall be entitled to a profit sharing contribution under Section 4.3 based on Compensation (as determined under Section 1.12, but without regard to the requirement that the compensation be earned while a Participant) received from the Employer during the period beginning on January 1, 2003 and ending on December 31, 2003.

US2008 5537123

## SCHEDULE D

## BLACK MOUNTAIN LIVERMORE UNION EMPLOYEES

This Schedule D provides effective as of April 1, 2002 special provisions for Black Mountain Livermore Union Employees as defined in Section 1.6 of the Plan. The provisions of the Plan including the definitions shall apply except as modified by this Schedule D. Effective as of January 1, 2004, the provisions of the Plan shall apply to individuals formerly designated as Black Mountain Employees, except that the forms of distribution specified under Section 7.4 of this Schedule D shall continue to apply until August 1, 2004.

I.   **DEFINITIONS**

The definitions set forth in the Plan shall apply except as follows:

A.   "Black Mountain Union Plan" shall mean a Black Mountain Livermore Union Employee's contributions under this Schedule D for the period April 1, 2002 through December 31, 2003.

B.   "Compensation" shall mean compensation as defined in Treas. Reg. Section 1.415-2(d)(2) and (3), but excluding overtime, commissions and bonuses, and including amounts contributed under a salary reduction agreement to the extent those amounts are not includible in gross income by virtue of Code Section 125, 402(e), 402(h), or 403(b).

For Plan Years beginning on or after January 1, 2002, Compensation of each Employee taken into account under this Plan shall not exceed $200,000 (or, such larger amount as determined by the Internal Revenue Service in accordance with Code Section 401(a)(17) to reflect increased in the cost of living.

D.   "Profit Sharing Contribution" shall mean the amount contributed by the Employer pursuant to Section 4.07(d) of Article II of this Schedule D.

E.   "Matching Contribution" shall mean the amount contributed by the Employer pursuant to Section 4.01(b) or Article II of this Schedule D.

II.   **ELIGIBILITY**

80

US2008 5537 5

A Black Mountain Livermore Union Employee shall be considered an Eligible Employee as of the following dates: (a) for purposes of the cash or deferred arrangement as specified in Schedule G, April 1, 2002; (b) for purposes of the Additional Contribution under Section 4.07(d), April 1, 2002; and (c) for purposes of the Profit Sharing Contribution specified in Sections 4.02 and 4.03, January 1, 2003.

## III.    SALARY REDUCTION PROVISIONS

The provisions of Article III of the Plan shall apply except Sections 3.1, 3.4 and 3.5 shall be modified as set forth below and Section 5.02 shall be deleted.

### 3.1    Salary Reduction Agreements

(a)    A Black Mountain Livermore Union Employee described in Section 1.6 may enter into a salary reduction agreement with the Employer which will be applicable to all payroll periods beginning on or after the date such Employee has satisfied the criteria for participation and shall remain in effect until changed or canceled by such Participant as specified in Section 3.3. The terms of any such salary reduction agreement shall provide that such Black Mountain Livermore Union Employee agrees to a reduction in salary from the Employer equal to a whole percentage of his or her Compensation for each payroll period. The Employer will contribute the amount of the salary reduction to the Plan into the Participant's Elective Deferral Account.

(1)    By electing to make a salary reduction, a Black Mountain Livermore Union Employee may make Basic Contributions between one percent (1%) and two percent (2%) of Compensation.   Basic Contributions will be matched by the Employer pursuant to Article III of this Schedule D.

(2)    In addition, a Participant who is making Basic Contribution of two percent (2%) of Compensation, may also make Additional Contributions between one percent (1%) and eighteen percent (18%) of Compensation. Additional Contributions are not matched by the Employer.

(3)    The rate of Elective Deferrals made by a Highly Compensated Employee may, from time to time, be restricted by the Employer or the Administrator, in order to comply with the limitations of Section 3.4.

US2008 553175 7

(b)     The Employer shall deposit an amount equal to the total amount deferred pursuant to salary reduction agreements under Section 3.1 of this Schedule D entered into between the Employer and Black Mountain Livermore Union Employee for such Plan Year.  Contributions made by the Employer for a given Plan Year pursuant to a Participant's salary reduction agreement under Section 3.1 of this Schedule D shall be deposited to the Participant's Elective Deferral Account as soon as practicable but not later than 90 days from the date on which they would otherwise have been paid to the Participant.

3.4     Aggregate Limitation of Salary Reduction Amounts -- the provisions of Sections 3.4 of the Plan shall apply to Black Mountain Livermore Union Employees except that the determination shall be made separately with respect to such employees.

3.5     Failure to Meet Actual Deferral Percentage Tests -- the provisions of Sections 3.5 of the Plan shall apply to Black Mountain Livermore Union Employees except that the determination shall be made separately with respect to such employees.

## IV.     CONTRIBUTIONS

The provisions of the Plan under Article IV shall apply except that (a) Section 4.01 shall be replaced as provided below, (b) Sections 4.2 and 4.3 shall be effective as of January 1, 2003 and (c) the Additional Contribution under Section 4.8 shall be as specified below.

4.1     Matching Contribution and Profit Sharing Contributions

Effective as of November 1, 2003, for each Black Mountain Livermore Union Employee who enters into a salary reduction agreement under Section 3.1 of this Appendix D, the Employer shall contribute a Matching Contribution for the Plan Year equal to one hundred percent (100%) of the Black Mountain Livermore Union Employee's Basic Contributions as specified in Section 3.1(c) up to a maximum of two percent (2%) of such Employee's Compensation for such Plan Year.

4.7     Additional Employer Contributions

Effective for the period April 1, 2002 through December 1, 2003, for each Black Mountain Livermore Union Employee who satisfies the eligibility criteria in paragraph (c) the Employer shall contribute an Profit Sharing Contribution for a Plan Year equal to the greater of

82

(1) 4% of the Participant's Compensation for that Plan Year, and (2) $100 for each month during the Plan Year in which the Participant is credited with an Hour of Service.

Only a Black Mountain Livermore Union Employee who is either (1) credited with a 1,000 Hours of Service during the Plan Year or (2) dies or has a Termination of Employment on or after his Early Retirement Date during that Plan Year, shall be eligible to receive an Profit Sharing Contribution for that Plan Year. For purposes of the prior sentence an Early Retirement Date is the date on which the Employee attains age 55 and has at least 10 Years of Vesting Service.

## VII.  DISTRIBUTION OF BENEFITS

The provisions of Article VII of the Plan apply except for periods prior to August 1, 2004, Sections 7.3 and 7.4 are modified as set forth below and Section 7.8 is deleted.

### 7.3    Distribution of Benefits Upon Death

A.     Subject to paragraph (B), if an active Participant dies before his or her entire Account Balance is distributed, the Participant's Account Balance shall become non-forfeitable and shall be payable to his or her Beneficiary or if the Participant has not designated a Beneficiary or if the Beneficiary does not survive the Participant, to the Participant's surviving Spouse, or if the Participant had not designated a Beneficiary and has no surviving Spouse, to his or her estate or legal representative.

B.     In the case of a Participant who is married at the time of his or her death and either has a nonforfeitable Account Balance at the time of his Termination of Employment or dies while an active Participant, his surviving Spouse shall receive a distribution of his Account Balance, unless the Participant elected that this benefit be provided to a designated Beneficiary and his Spouse consented to such an election.  The Committee Delegate shall give each Participant written notice of his or her right to waive the right to have his or her Spouse receive the death benefit under this paragraph (B).  The notice, which shall be given in the manner provided in regulations promulgated by the Internal Revenue Service, shall contain an explanation of the terms and conditions of the election and its effects upon the Participant's benefit (in terms of dollars per annuity payment), the requirement that the Participant's Spouse must consent to the election in accordance with Section 7.4(B)(3).  If the value of the Spouse's death benefit under this paragraph

83

(B) exceeds $5,000 it shall be distributed in the form of a life annuity unless the Spouse elects a non-annuity form of distribution.  If the value of the Spouse's death benefit under this paragraph (B) is $5,000 or less it shall be distributed as single cash distribution.

The Trustee shall pay the Account Balance valued as of the Valuation Date coincident or following the Participant's date of death.

7.4    Forms of Distribution

A.    In the case of a Black Mountain Livermore Union Employee who has an Account Balance with a value which exceeds $5,000, he may elect subject to paragraph (B) to receive distribution of his Account Balance in any of the forms as set forth below:

    (1)    a single life annuity,

    (2)    a Qualified Joint and Survivor annuity;

    (3)    a Qualified Optional Survivor annuity;

    (4)    a single cash payment

    (5)    installments for a specified period not exceeding the Participant's life expectancy or the joint and survivor life expectancy of the Participant and his or her Beneficiary.

B.    Joint and Survivor Annuity Forms of Payment

    (1)    If a married Participant who is entitled to elect a form of distribution described in paragraphs (A)(2) and (A)(3) elects to receive a distribution in the form of a life annuity specified under paragraph (A)(1) then he or she shall receive distribution of his or her Account Balance in the form of a Qualified Joint and Survivor Annuity (as defined in paragraph B(4)), unless the Participant's Spouse has consented to that election.  The consent must be made during the 180 day period ending on the date distribution is to commence under paragraph (2). Notwithstanding the prior sentence, the election will not be required to be made earlier than 30 days after the Participant receives notice of his right to waive the Qualified Joint and Survivor Annuity or to receive a distribution. The Participant may waive the 30 day notice requirement (with applicable spousal consent) provided the Participant's waiver acknowledges his right to 30 days notice and distribution does not commence until at least seven days after the Participant has received the notice.  Both the Participant's waiver and the Spouse's consent must state the particular optional

form of benefit to be distributed and any Beneficiary or class of Beneficiaries other than his or her Spouse. Alternatively the Spouse's consent may permit the Participant to elect any optional form of benefit available under the Plan (subject to paragraph (5) below pursuant to which no spousal consent is required) and designate any contingent Beneficiary. Such a general consent must acknowledge that the Spouse has voluntarily relinquished rights to limit consent to a specific form of benefit or Beneficiaries or both. Any such election may be revoked at any time before distribution of benefits commences and, once revoked, may be made again.

(2)     Within the period beginning no earlier than 180 days before the date distribution of benefits to a Participant is to commence and no later than 30 days before distribution of benefits is to commence, the Committee Delegate shall provide a married Participant (who elects a form of distribution described in paragraph (A) with a notice of his right to elect to waive his right to receive distribution of his Account Balance in the form of a Qualified Joint and Survivor Annuity. The notice shall contain an explanation in non-technical language, of (a) the terms and conditions of the election and its effects upon the Participant's benefit, (b) the requirement that the Participant's Spouse must consent to the election in accordance with paragraph (3), (c) the Participant's right to revoke the election in the manner provided in regulations promulgated by the Internal Revenue Service, and (d) a general description of the eligibility conditions and other features of the optional forms of benefit under the Plan and sufficient information to explain the relative values of these optional forms of benefits.

(3)     A Participant's election to have the distribution of his benefits in the form of an annuity other than a Qualified Joint and Survivor Annuity or a Qualified Optional Survivor Annuity under paragraph (A) and not to have his Spouse receive the death benefit shall be valid only if either, (a) his Spouse executes a written consent to the election and acknowledges the effect of the election and the consent is witnessed by a plan representative or notary public or, (b) the Participant establishes that the consent described in clause (a) cannot be obtained because, (i) he does not have a Spouse, his Spouse cannot be located, or for such other circumstances as may be provided in regulations promulgated by the Internal Revenue Service, (ii) the Participant is legally separated from the Spouse or (iii) the Participant has been abandoned by his Spouse (within the meaning of local law) and the Participant has a court order to that effect. A Participant's election shall only be effective with respect to the Spouse who consents to it as provided in this paragraph (3).

US2008.3387173.2

(4)     For purposes of this B a "Qualified Joint and Survivor Annuity" shall mean - an annuity for the life of a Participant with a survivor annuity for the life of the Participant's Spouse where the survivor annuity is 50% of the annuity payable during the joint lives of the Participant and the Participant's Spouse and the joint and survivor annuity is actuarially equivalent in value to the Participant's Vested Interest.

(5)     For purposes of this B a "Qualified Optional Survivor Annuity" shall mean - an annuity for the life of a Participant with a survivor annuity for the life of the Participant's Spouse where the survivor annuity is 75% of the annuity payable during the joint lives of the Participant and the Participant's Spouse and the joint and survivor annuity is actuarially equivalent in value to the Participant's Vested Interest.  For purposes of the election described in paragraph (3) above, the Qualified Optional Survivor Annuity is treated as a Qualified Joint and Survivor Annuity form of benefit for purposes of determining whether spousal consent is required with respect to a waiver of the Qualified Joint and Survivor Annuity in favor of the Qualified Optional Survivor Annuity form of benefit. Thus, no spousal consent is required to waive out of the Qualified Joint and Survivor Annuity form of benefit in favor of an actuarially equivalent Qualified Optional Survivor Annuity form of benefit.  A Qualified Optional Survivor Annuity is effective for distributions which commence on or after January 1, 2008.

US2008 553 715 7

## SCHEDULE E

### SPECIAL PROVISIONS FOR ROTH ELECTIVE DEFERRALS FOR TRADEWINDS PARTICIPANTS

Part 1. General Application.

A.    This Schedule E will apply to Roth contributions transferred to the Plan from the Tradewinds Plan (as referenced in Section 1.34 of the Plan)

B.    A Tradewinds Participant's Account Balance described in Paragraph A above will be allocated to a separate account maintained for such elective deferrals.

C.    Unless specifically stated otherwise, Roth elective deferrals will be treated as Elective Deferrals for all purposes under the Plan.

D.    For purposes of distributions and withdrawals under Article VII, amounts in a Tradewinds Participant's Roth Elective Deferral Account will be distributed or withdrawn only after the distribution or withdrawal of all other amounts in the Participant's Accounts that are eligible for such distribution or withdrawal.

E.    For purposes of loans under Article VIII, in determining the amount available for a loan, the Roth Elective Deferral Account will be treated as Elective Deferrals, but will not be available for a distribution or offsets in the event of failure to repay the full amount of the outstanding loan balance.

Part 2. Separate Accounting.

A.    Contributions and withdrawals of Roth elective deferrals will be credited and debited to the Roth Elective Deferral Account maintained for each Tradewinds Participant.

B.    The Plan will maintain a record of the amount of Roth elective deferrals in each Tradewinds Participant's account.

C.    Gains, losses, and other credits or charges must be separately allocated on a reasonable and consistent basis to each Tradewinds Participant's Roth Elective Deferral Account and the Participant's other accounts under the Plan.

87

D.      No contributions other than Roth elective deferrals and properly attributable earnings will be credited to each Tradewinds Participant's Roth Elective Deferral Account.

Part 3. Direct Rollovers.

A.      A direct rollover of a distribution from a Roth Elective Deferral Account under the Plan will only be made to another Roth elective deferral account under an applicable retirement plan described in Code Section 402A(e)(1) or to a Roth IRA described in Code Section 408A, and only to the extent the rollover is permitted under the rules of Code Section 402(c).

B.      The Plan will not provide for a direct rollover (including an automatic rollover) for distributions from a Participant's Roth Elective Deferral Account if the amount of the distributions that are eligible rollover distributions are reasonably expected to total less than $200 during a year. In addition, any distribution from a Participant's Roth Elective Deferral Account is not taken into account in determining whether distributions from a Participant's other accounts are reasonably expected to total less than $200. However, eligible rollover distributions from a Participant's Roth Elective Deferral Account are taken into account in determining whether the total amount of the Participant's account balances under the Plan exceeds $1,000 for purposes of mandatory distributions from the Plan.

C.      The provisions of the Plan that allow a Participant to elect a direct rollover of only a portion of an eligible rollover distribution but only if the amount rolled over is at least $500 is applied by treating any amount distributed from the Participant's Roth Elective Deferral Account as a separate distribution from any amount distributed from the Participant's other accounts in the Plan, even if the amounts are distributed at the same time.

Part 5. Definitions.

A.      Roth Elective Deferrals. A Roth elective deferral is an Elective Deferral that is:

88

(a)   Designated irrevocably by the Participant at the time of the cash or deferred election as a Roth elective deferral that is being made in lieu of all or a portion of the pre-tax elective deferrals the Participant is otherwise eligible to make under the Plan; and

(b)   Treated by the Employer as includible in the Participant's income at the time the Participant would have received that amount in cash if the Participant had not made a cash or deferred election.

## SCHEDULE F

## ELIGIBILITY PROVISIONS

Notwithstanding the eligibility provisions under Section 3.1 or any Schedule to the Plan, the following provisions shall apply:

a) Prior to January 1, 1997, each Eligible Employee who is employed on a regular full-time basis, shall become a Participant on the Entry Date which coincides with or next follows the later of three (3) months after his or her Employment Commencement Date and his or her eighteenth (18) birthday.

b) An Eligible Employee who either (1) is not employed on a full time basis ("part-time basis") or (2) is not a regular employee and who was hired on or after March 10, 2008 and before January 1, 2010 shall become a Participant as of the first day of the month which coincides with or next follows his or her completion of a Period of Service of six months, provided he or she is at least eighteen (18) years of age as of such date; and (b) if such Employee has a Severance from Service Date before he becomes a Participant and who is rehired as an Eligible Employee on a part-time basis or after January 1, 2011 and before April 1, 2012 (and such rehire occurs after the January 1st or July 1st next following his being credited with a   six-month Period of Service) shall become a Participant as soon as administratively practicable next following his rehire.

c) In addition, the following rules apply: (i) in the case of a Former Teamster Participant, he shall become a Participant on July 1, 1998 (or, if later, the date the Employer otherwise satisfies the requirements of Section 1.15), (ii) in the case of an individual who was employed by Modesto on June 18, 2001, he shall become a Participant on June 19, 2001 (or, if later, the date the Employee otherwise satisfies the requirements of Section 1.15), (iii) in the case of a salaried employee who was a participant in the Black Mountain Plan on December 31, 2001, he shall become a Participant on January 1, 2002 (or, if later, the date the Employee otherwise satisfies the requirements of Section 1.15), (iv) in the case of an Employee who was a participant in the Black Mountain Plan on March 31, 2001, he shall become a Participant on April 1, 2002 (or, if later, the date the Employee otherwise

90

satisfies the requirements of Section 1.15, (v) in the case of a salaried employee who was a participant in the Nestlé Waters (Sparkling Spring) Profit Sharing and 401(k) Plan on July 31, 2002, he shall become a Participant on August 1, 2002 (or, if later, the date the Employee otherwise satisfies the requirements of Section 1.15), (vi) in the case of an Employee who was a participant in the Nestlé Waters (Sparkling Spring) Profit Sharing and 401(k) Plan on April 30, 2003, he shall become a Participant in the Plan on May 1, 2003, and (vii) in the case of a Poland Spring Employee, he shall become a Participant on or after January 2, 2005 (or, if later, the date the Employee otherwise satisfies the requirements of Section 1.15).

d) Prior to January 1, 2002, individuals who were employed by the Aqua Cool Division of Ionics on December 31, 2001 and become employed by the Company on January 1, 2002 were excluded from participation in the Plan

91

US2008 5517758.7

# Exhibit D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------- X
DESMOND DYKE,

                          Plaintiff,          Index No.: 504332/2016

             v.

T. ROWE PRICE RETIREMENT PLAN      **NOTICE OF FILING NOTICE OF**
SERVICES, INC.,                               **REMOVAL**

                       Defendant.       **VIA ECF**

-------------------------------------------------- X

           Defendant T. ROWE PRICE RETIREMENT PLAN SERVICES, INC., by its

attorneys, filed a "Notice of Removal" in the above-captioned case from the Supreme Court of

the State of New York, County of Kings, with the United States District Court for the Eastern

District of New York, pursuant to 28 U.S.C.A. §§ 1441 and 1446. A copy of the Notice of

Removal, with attachments, is attached hereto as **Exhibit 1.**

Dated: May 18, 2016
     New York, New York

                              Respectfully submitted,

                              JACKSON LEWIS P.C.
                              *ATTORNEYS FOR DEFENDANT*
                              666 Third Avenue, 29th Floor
                              New York, New York 10017
                              P: (212) 545-4000
                              F: (212) 972-3213

               By:      _____
                              Douglas J. Klein

TO:        RAYMOND RAGUES, ESQ.
            RAGUES PLLC
            33 WEST 19TH STREET, 4TH FLOOR
            NEW YORK, NY 10011

<u>AFFIDAVIT OF SERVICE</u>

STATE OF NEW YORK      )
                                         ) SS.:
COUNTY OF NEW YORK  )


Douglas J. Klein, being duly sworn, deposes and states that, I am not a party to this action, am over the age of 18 and reside in Hoboken, New Jersey.

On May 18, 2016, I served the within **Notice of Filing of Notice of Removal**, by depositing a true and correct copy thereof, enclosed in a Federal Express envelope, by Federal Express, addressed to the following persons at the last known address:

RAYMOND RAGUES, ESQ.
RAGUES PLLC
33 WEST 19TH STREET, 4TH FLOOR
NEW YORK, NY 10011


Douglas J. Klein


Sworn to before me on this
18th day of May, 2016


Notary Public

**SUZANNE E. PETERS**
**Notary Public, State of New York**
**No. 02PE6317148**
**Qualified in New York County**
**Commission Expires December 29, 2018**